**In re PENNACO ENERGY, INC.**
**Shareholders Litigation**

**Civil Action No. 18606.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 1, 2001.
Decided: Feb. 5, 2001.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware, Delaware Liaison for Plaintiffs; Jonathan M. Plasse, of Goodkind Labaton Rudoff & Sucharow, New York, New York; Shane T. Rowley, Faruqui & Faruqui, New York, New York, Plaintiffs' Co–Lead Counsel.

James L. Holzman, Bruce E. Jameson, and William M. Kelleher, of Prickett, Jones & Elliott, Wilmington, Delaware; Charles W. Schwartz, Max Hendrick, III, and Kelley M. Keller, of Vinson & Elkins, Houston, Texas, for Defendants Pennaco Energy, Inc., Paul M. Rady, Glen C. Warren, Jr., Gregory V. Gibson, David W. Lanza, and Kurt M. Petersen, of counsel.

Charles F. Richards, Jr., J. Travis Laster, and Andrea K. Short, of Richards, Layton & Finger, Wilmington, Delaware; James Edward Maloney, of Baker Botts, Houston, Texas, for Defendant Marathon Oil Acquisition 1, Ltd., of counsel.

## OPINION

STRINE, Vice Chancellor.

Shareholder plaintiffs seek a preliminary injunction against the February 5, 2001 closing of a tender offer by an acquisition subsidiary of Marathon Oil ("Marathon") for all the shares of Pennaco Energy, Inc. ("Pennaco"). The tender offer price is $19 per share and Marathon intends to consummate a back-end merger at the same price to cash-out any shares it does not acquire. The offer price is at a substantial premium to Pennaco's pre-offer trading price.

The plaintiffs contend that the Pennaco directors did not undertake efforts that were reasonably calculated to secure the best value. Because the Pennaco board did not actively shop the company and relied solely on a post-agreement market check, the plaintiffs assert that the directors' efforts were so deficient as to justify the entry of an injunction. The plaintiffs couple this argument with an attack on the directors' motives. In particular, the plaintiffs claim that Pennaco's two top-ranking officers, who are on the Pennaco board, loaded themselves up with severance benefits and options in contempla-

tion of a sale. These officers, plaintiffs contend, were motivated to secure less than the best price and diverted an unfair portion of the sale price to themselves.

Finally, the plaintiffs contend that the Pennaco directors have not disclosed all the material facts bearing on the decision facing the Pennaco stockholders. In particular, the plaintiffs argue that the Pennaco directors have not disclosed material information regarding the value of Pennaco that was generated by a director who is the company's Chief Financial Officer ("CFO"). This information was contained in documents that were not produced in discovery until after the CFO had testified in his deposition in a manner that appeared to be contradicted by those late-emerging documents. If reliable, the information in the documents bears materially on the value of Pennaco.

In this opinion, I deny plaintiffs' request for a preliminary injunction. To address the problematic evidentiary record that existed as of oral argument, the court suggested that the CFO be deposed again. He was, and his deposition testimony, coupled with the circumstances which gave rise to his creation of the documents plaintiffs seek to have disclosed, persuades me that the documents do not contain material information that should have been disclosed. Rather, the documents seem to be mere bargaining devices, which lack sufficient reliability and factual support to warrant disclosure.

Likewise, the court finds that the plaintiffs' other claims will not support injunctive relief. Given the deference that must be afforded directors in deciding how to sell a corporation, the court cannot conclude that the Pennaco board failed to undertake reasonable efforts to get the best available price. Although the board negotiated with a single bidder, it bargained hard and made sure that the transaction was subject to a post-agreement market check unobstructed by onerous deal protection measures that would impede a topping bid.

Nor am I convinced that the directors were likely motivated by the desire for employment-related benefits rather than their desire to receive the best price. Pennaco's two top executives owned a substantial amount of equity and the changes to their employment agreements challenged by the plaintiffs had a rational business purpose.

## I. *Factual Background*

### *Pennaco And Its Directors*

Pennaco is a Delaware corporation with its principal executive offices in Denver, Colorado. Pennaco was formed in early 1998 to explore for and produce natural "methane" gas from coal beds in the Powder River Basin in Wyoming.

The Pennaco board is comprised of five members, each of whom has been named as a defendant in this action:

- Paul M. Rady joined the company in July 1998 as Chief Executive Officer ("CEO") and President, and assumed the additional title of Chairman of the Board in September 1999. Rady has spent his career in oil and gas exploration, and was CEO of Barrett Resources Corporation, an oil and gas exploration company, immediately before joining Pennaco.
- Glen C. Warren, Jr. came on board at Pennaco with Rady as CFO and Executive Vice President in July 1998. Before joining Pennaco, Warren was an investment banker with Lehman Brothers. At the inception of his career, Warren spent six years in the oil and gas business.
- Gregory V. Gibson is Pennaco's Vice President for Legal Affairs and Secretary. Although he serves as an of-

ficer of Pennaco, Gibson is a California-based attorney with the firm of Gibson, Haglund & Paulsen. Gibson specializes in securities law and has experience serving as counsel to other corporations.

- David W. Lanza has major managerial and equity positions in several diverse businesses. Among his activities has been the development of oil and gas properties in the Southwestern United States.
- Kurt M. Petersen is a partner in the natural resources department of Davis, Graham & Stubbs, a Denver law firm. Petersen has extensive experience in legal matters relevant to the acquisition and sale of energy-producing properties. Davis, Graham provides legal services to Pennaco, and billed the company over $286,000 in 1999.

### Pennaco Gets Off To A Good Start

During its first year of existence, Pennaco's business concentrated on those tasks necessary to begin producing natural gas, and acquired hundreds of thousands of acres from which natural gas could be extracted. To facilitate its ability to produce natural gas from the properties it believed would yield good results, Pennaco also sought out a strategic relationship with a more established energy company.

To that end, Pennaco had discussions about entering into a strategic partnership with twenty to thirty other companies, including Marathon. On October 23, 1998, Pennaco consummated such a partnership with CMS Oil & Gas Co ("CMS"). The partnership involved the sale to CMS of a 50% working interest in nearly 500,000 acres in an "Area of Mutual Interest" ("AMI") in the Powder River Basin. The sale price yielded Pennaco a hefty profit on its costs to purchase the acreage, thereby allowing the company to develop its other acreage in the Powder River Basin at a productive clip. The partnership also gave Pennaco access to CMS's pipeline infrastructure, which facilitated extraction from the AMI properties.

### Pennaco Receives Feelers About A Sale

Pennaco's ability to identify and acquire the production rights on attractive energy-producing properties was soon noticed by other industry players. Thus, in the first half of 2000, the company received feelers about whether it was willing to be acquired. Rather than resisting any overtures, Rady and his management team were willing to provide information and discuss an acquisition with any reputable company in the industry. Rady also made it a practice to inform the board about these inquiries.

Interestingly, although they draw different inferences from this fact, both the plaintiffs and the defendants agree that there was significant industry interest in Pennaco in 2000, that Pennaco was covered by several industry analysts, and that Pennaco was the subject of takeover rumors.

### The April 2000 Annual Meeting

At the 2000 annual meeting of the company, the directors proposed that Pennaco be reincorporated into Delaware to "enhance [Pennaco's] ability to consider all appropriate courses of action with respect to significant transactions for the benefit of all stockholders." [1] The stockholders agreed.

In addition, the Pennaco stockholders assented to the issuance of 1,000,000 additional options under the company's stock option plan. The company's stockholders were told that the 269,272 shares remaining under the option plan were insufficient to fully serve the company's long-term

1. Rady Ex. 12 at PEN00062.

compensation needs in the year 2000 and beyond.

*The Pennaco Board Issues Options And Amends Certain Employment Agreements At Its July 28, 2000 Board Meeting*

On July 28, 2000, the Pennaco board met. At that meeting, the board's compensation committee – comprised of directors Petersen and Lanza – met to consider management's recommendations regarding the issuance and allocation of new options. The committee agreed to management's recommendations and the full board thereafter granted a substantial number of the newly authorized options at an exercise price of $12 per share. Each of the defendant directors received options in the following amounts: Rady, 140,000; Warren, 100,000; Gibson, 50,000; Petersen, 40,000; and Lanza, 40,000. Over 400,000 options were issued to employees who were not directors.[2] These option grants increased the directors' total holdings[3] of Pennaco shares as follows:

| | Options held pre 7/28/00 | Shares held pre 7/28/00 | Total shares and options held pre 7/28/00 | Shares/ options as percentage of outstanding shares and options | Options granted 7/28/00 | Total shares and options held post 7/28/00 | Shares/ options as percentage of outstanding shares and options |
|---|---|---|---|---|---|---|---|
| P. Rady | 1,277,750 | 857,145 | 2,134,895 | 10.4% | 140,000 | 2,274,895 | 10.8% |
| G. Warren | 830,978 | 262,500 | 1,093,478 | 5.5% | 100,000 | 1,193,478 | 5.8% |
| D. Lanza | 33,000 | 76,000 | 109,000 | 0.57% | 40,000 | 149,000 | 0.75% |
| K. Petersen | 30,000 | none | 30,000 | 0.15% | 40,000 | 70,000 | 0.35% |
| G. Gibson | 155,000 | none | 155,000 | 0.8% | 50,000 | 205,000 | 1.03% |
| Total | 2,326,728 | 1,195,645 | 3,522,373 | 17.42% | 370,000 | 3,892,373 | 18.73% |

It is important to note that it was already the case that any options issued to Pennaco employees and directors would vest in the event of a change in control. That is, in a change of control, all issued options could be exercised by the optionee at the strike price.

*The Pennaco Board Begins To Amend The Employment Agreement Of Key Executives*

At its July 28, 2000 board meeting, the Pennaco board also amended the employment contracts of certain top Pennaco executives and began a discussion of changing Rady's and Warren's contracts.

The board's actions on July 28, 2000 manifest concerns that Rady had begun to address earlier in the year. In January 2000, Rady met with representatives of the consulting firm Arthur Andersen to discuss the possibility of improving the compensation arrangements between Pennaco and its top executives. Some time lapsed, however, before Rady reinitiated contact with Arthur Andersen in early July.

Two primary issues occupied Rady's discussions with Arthur Andersen. One, both Warren and Rady had employment agree-

---

**2.** Even with these new grants, the total number of options issued under Pennaco's stock option plan is around 16–17% of the company's total equity, a level that is relatively common today.

**3.** That is, the total includes shares and options to purchase shares.

ments that provided them with non-discretionary bonuses tied to the company's cash flow. Rady was concerned that this arrangement might not be the optimal way to align his and Warren's interests with those of the equity holders.

Two, since the time they joined Pennaco, Rady and Warren had agreements that provided them with the right to severance payments of $3 million and $1.5 million respectively in the event of change of control ("Change In Control Severance"). The Change In Control Severance, however, was not tied to any provision that would prevent them from competing with Pennaco. This raised two subsidiary issues. The first is that any acquiror of Pennaco would have no protection from competition from Rady and Warren, as well as other key Pennaco executives. This could be of concern to an acquiror because Rady had left his previous employer, Barrett Resources, and immediately began to compete with it in the Powder River Basin.

The second and much larger concern was the potentially very large tax benefits that would arise from tying severance in a change of control to a non-competition agreement. Absent a non-compete, the Change In Control Severance owed to Rady and Warren might be subject to adverse tax treatment. Rady and Warren could be subject to a substantial excise tax on top of the normal federal income tax that would apply to the Change In Control Severance. For its part, Pennaco could lose the right to deduct the Severance as a compensation expense.

If the Change In Control Severance was tied to a non-compete that provided real value to Pennaco, Pennaco was advised that the risk of such adverse tax treatment would be minimized. The other way that it could protect employees was to provide so-called "gross up" protection that would obligate Pennaco to bear any excise tax

imposed on the Change In Control Severance.

As of the July 28, 2000 board meeting, Rady had reinitiated contact with Arthur Andersen, but the meeting occurred before Arthur Andersen had begun serious work on Rady's and Warren's contract.

At the board meeting, the directors discussed Rady's and Warren's contracts, but did not act on them. Upon management's recommendation, however, the compensation committee did authorize the company to enter into employment contracts with three top Pennaco executives, Terry Dobkins, Brian Kuhn, and director Gibson. Each of these agreements had two key severance elements: (1) "Termination Severance" that would be made to the employee if the employee were terminated without cause and no change of control occurred; this element was not subject to a non-compete agreement; and (2) Change In Control Severance that bound the employee not to compete for two years in the Powder River Basin. The Change of Control Severance was in each case substantially higher than the Termination Severance.

### Rady And Warren Meet With Arthur Andersen To Discuss Their Own Employment Contracts

On August 3, 2000, Rady and Warren met with Arthur Andersen to discuss their own employment agreements. As of that time, Rady and Warren had packages with the following core elements: (1) salary; (2) stock options, all of which would vest upon a change in control; (3) a non-discretionary annual bonus tied to cash flow; (4) Termination Severance; and (4) Change In Control Severance not tied to a non-compete.

At the meeting, the participants discussed many of the issues highlighted above, including the possibility that the

current agreements subjected Rady, Warren, and Pennaco to adverse tax consequences in the event of a change in control. The participants focussed on the use of non-competes as a way to reduce this risk.

At a later September 7, 2000 meeting, Arthur Andersen was asked to calculate the potential implications of adverse tax treatment on a potential acquiror and departing executives in the event of a change in control.

### Marathon Contacts Pennaco

The very next day–September 8, 2000–Marathon contacted Rady. Douglas Brooks, manager of Business Development for Marathon's Rocky Mountain Region, called Rady to ask if Pennaco would be interested in exploring a business combination with Marathon.

As was his consistent approach to such overtures from industry players, Rady welcomed discussions with Marathon. He promptly sent Marathon a Pennaco financial presentation and a package of other materials Pennaco used with the investment community. Rady heard nothing further from Marathon until early November.

In the same time period, Rady also received an expression of interest from Alberta Energy Company. Rady and Warren met with Alberta and provided Alberta with Pennaco's "pitch" book, but Alberta never expressed any serious intent to proceed with acquisition discussions.

### Rady, Warren, And Arthur Andersen Meet Again

On October 11, 2000, Arthur Andersen again met with Rady and Warren. At that meeting, Arthur Andersen advised Rady and Warren that it was likely that the acceleration of vesting on their options at a change in control would expose them to the excise tax and Pennaco to loss of de-

ductibility. Similarly, Arthur Andersen believed that the Change In Control Severance would receive similarly negative treatment. Arthur Andersen advised that non-competes could be used to ameliorate this risk and that Arthur Andersen should perform valuations of non-compete agreements in order to shape new employment agreements for Rady and Warren.

### Pennaco And CMS Amend Their Joint Venture Agreement

On November 8 or 9, 2000, Rady secured an important amendment to the company's agreement with CMS. The amendment eliminated a provision of the agreement that required that if either of the parties experienced a change in control, the other party would have the right to take over the operations in the AMI. Without this amendment, it would be difficult, if not impossible, to sell Pennaco at a favorable price.

The amendment was also important to CMS, which was in the midst of planning an initial public offering ("IPO") scheduled for early 2001. Without an amendment to the joint venture agreement, Pennaco's take-over rights would dampen investors' interest and impair the IPO price.

### Marathon Comes Around Again

On November 8, 2000, Rady heard from Marathon again. This time the inquiry came from a much higher-placed Marathon executive: its President, Clarence Cazalot. Cazalot asked Rady whether he would be open to discussing an acquisition of Pennaco by Marathon.

Rady said yes and agreed to meet with Cazalot two days later in Houston. Rady promptly advised the other Pennaco directors of these events. On November 10, 2000, Rady and Warren met with Cazalot and other Marathon executives in Houston. The parties agreed to explore a combination and to begin due diligence on a

fast track. Upon his return to Denver, Rady brought the other directors up to date.

*Pennaco Enters Into A Confidentiality Agreement With Marathon And Amends Rady's And Warren's Employment Agreements – On The Same Day*

On November 15, 2000, two important events occurred. First, Pennaco executed a final confidentiality agreement, which was accepted by Marathon the next day. This opened the way for due diligence to begin November 16. As a price of obtaining access to information, Marathon acceded to a stand-still that prevented it from making a hostile overture for Pennaco for two years.

The second key event occurred at a Pennaco board meeting, which focussed on the executive compensation issues that Arthur Andersen had been examining. Arthur Andersen representatives were present at the initial portion of the meeting and reported to the board on the tax implications of the company's current agreements with its executives and the ramifications of changing the structure of these agreements.

After Arthur Andersen was excused, the full board had a discussion, followed by a compensation committee meeting. At that meeting, the compensation committee agreed to management's recommendations for changes. These changes involved, among other things: (1) the provision of gross-up protection to eleven Pennaco officers and directors, including all the directors; (2) the consummation of non-compete agreements between Pennaco and five of its executives, including Rady, Warren, and Gibson; (3) the retention of Arthur Andersen to provide opinion letters supporting favorable tax treatment of non-compete agreements between Pennaco and its executives; (4) the extension of one year of health benefits to certain executives upon a change in control for five Pennaco executives, including Rady, Warren, and Gibson.

The change most relevant to this case, however, was to Rady's and Warren's own employment agreements. The board authorized that the Change In Control Severance Rady and Warren would receive would be increased substantially in exchange for a non-compete agreement. Warren recommended the levels of these increases, which were apparently accepted by the compensation committee without resistance. A comparison of their then-existing contracts with the board's decision on November 15 follows:

| PAUL RADY | As of November 15, 2000 | As amended November 15, 2000 |
|---|---|---|
| Non-discretionary annual bonus | 2% of cash flow prior to interest expense ($520,000 for yr. 2000) | None after year 2000 |
| Severance payment payable on a termination without cause prior to a change in control | $3,000,000 | $3,000,000 |
| Severance payment on termination in connection with a change in control | $3,000,000 without Gross-Up Protection | None |
| Non-compete payment upon termination in connection with a change in control | None | $6,000,000 with Gross-Up Protection |
| Health insurance at employee rate for one year following a change in control | None | Yes |

| GLENN WARREN | As of November 15, 2000 | As amended November 15, 2000 |
|---|---|---|
| Non-discretionary annual bonus | 1% of cash flow prior to interest expense ($260,000 for yr. 2000) | None after year 2000 |
| Severance payment payable upon a termination without cause prior to a change in control | $1,250,000 | $2,000,000 |
| Severance payment upon a termination in connection with a change in control | $1,500,000 without Gross-Up Protection | None |
| Non-compete payment upon termination in connection with a change in control | None | $4,000,000 with Gross-Up Protection |
| Health insurance at employee rate for one year following a change in control | None | Yes |

As shown, while Rady and Warren gave up their non-discretionary bonuses in years after 2000, they did not waive their right to their bonuses for year 2000 and in fact received those bonuses later in the year.

All of the employment changes approved were voted upon by the full board, despite the fact that the changes affected Rady, Warren, and Gibson in clearly material ways and that all the directors received gross-up protection.

At the end of the meeting, Rady brought the board up to speed on where things stood with Marathon, and the fact that the company had also received feelers from Alberta.

### What The Pennaco Board Did Not Do

Although Pennaco was not prohibited by its confidentiality agreement with Marathon from exploring if other parties were interested in purchasing the company, neither Pennaco's board nor its management did anything to canvass the market. Nor did Pennaco retain an investment banker for this purpose. Instead, the directors focussed solely on Marathon.

Management, however, did begin to identify investment bankers for possible retention in connection with Marathon's interest or an alternative transaction that might arise. Among the firms that management contacted were Lehman Brothers, Credit Suisse First Boston ("CSFB"), and Bear Stearns.

Pennaco received pitch books from Lehman and CSFB, both of which were distributed to the board.[4] The Lehman pitch book emphasized that Pennaco's ability to get the best price in a sale would largely turn on the certainty potential buyers had about Pennaco's future production potential. To that end, Lehman recommended, among other things, that Pennaco procure a "Third-party audited year-end reserve report" to display the company's natural gas reserves as credibly and accurately as possible.[5] Lehman also outlined the pro's and con's of selling the company through a process focussing on one or a small group of selected buyers at one time as opposed to a broader canvass, and identified several potential buyers.

CSFB provided Pennaco with various preliminary valuation analyses, including an NAV indicating a range of value for Pennaco between $17.88 and $20.81 per share, using Pennaco's June 30, 2000 Reserve Report (the "June 30 Reserve Re-

---

4. Warren 61–62.

5. Pipkin Ex. 1 at PEN000629.

port").[6] Like Lehman, CSFB stressed the importance of the company's production potential as a driver of value and outlined the advantages and risks of various approaches to selling the company.

*Marathon Makes Its First Bid*

After three weeks of due diligence involving regular communications with Pennaco executives, Marathon made its first specific offer. On December 7, 2000, Cazalot offered to purchase all of Pennaco's shares at $17 per share.

The Pennaco board met the next day and decided that the offer was inadequate. After considering the advisability of pursuing a sale in view of the potential gains and risks associated with continuing to operate Pennaco as a stand-alone, the board decided, however, to continue discussions with Marathon because a sale at the right price could be the company's best strategy. The board authorized Rady to reject the $17 offer and to seek a price "north of $20 a share." [7] Management was also authorized to retain outside counsel and a financial advisor.

On December 9, 2000, Rady told Cazalot that his offer was insufficient and tried to convince Cazalot to raise his bid. In support of that effort, Warren sent a key Marathon executive an e-mail the next day containing arguments justifying a higher value for Pennaco (the "Warren E–Mail").

The Warren E–Mail first tried to convince Marathon that Pennaco's oil reserves were more extensive than were indicated by Pennaco's most recent reserve report, which was the internal June 30 Reserve Report. Without burdening the reader with an explanation of the nuances involved, it is critical to note that gas compa-

nies like Pennaco are valued principally on their ability to produce natural gas. Thus, purchasers such as Marathon will look to the so-called "reserves" of a target company as an important part of their pricing decisions. For purposes of this opinion, it is sufficient for the reader to understand that the market places the highest value on "proven" reserves, less value on "probable" reserves, even less value on "possible" reserves, and the lowest value on unevaluated land whose reserve potential is not known.[8]

As of June 30, 2000, Pennaco's proven oil reserves were estimated at 195 billion cubic feet of natural gas, and its combined probable/possible reserves were possibly as high as 875 billion cubic feet of natural gas, for a total of 1.070 trillion cubic feet. Pennaco also owned 273,000 acres that had not been evaluated.

In his E–Mail, Warren attempted to convince Marathon that Pennaco's reserve numbers as of that time exceeded the publicly disclosed June 30, 2000 estimates. In particular, Warren stated:

> We would expect our year-end proved to exceed the 195 Bcf mid-year number. . . .

> We are in the process of engineering . . . additional probable reserves and would fully expect our total proved, probable and possible reserves to then exceed 1.5 Tcf based on our current acreage position. . . . [9]

At the same time as he was trying to convince Marathon that Pennaco's reserves were higher than on June 30, 2000, Warren also tried to convince Marathon that Pennaco was worth more than $20 a share based on the June 30 Reserve Re-

---

**6.** Pipkin Ex. 2 at PENOOO667.

**7.** Rady 132.

**8.** This subject is quite complex and the court does not pretend to have mastered it in the time afforded it to issue this decision.

**9.** Plasse 1/25/01 Aff. Ex. 1.

port. To that end, Warren presented a net asset valuation (the "Warren NAV") using the June 30 Reserve Report. That valuation placed a value of $200 an acre on Pennaco's unevaluated acreage, a per acre figure that Warren identified as "conservative." The Warren NAV produced a per share valuation range of $21.23 to $24.93 a share.

### Pennaco And Marathon Agree In Principle To A Deal At $19 A Share

On December 14, 2000, Cazalot increased Marathon's offer to $19 a share. Rady took this offer to his board the same day. The board instructed Rady to see if there was "any more room above the $19 a share." [10]

At the same meeting, the board authorized the retention of Lehman Brothers as the company's investment banker.[11] The Lehman team was to be led by Gregory Pipkin, an extremely well-qualified investment banker who leads Lehman's energy practice. Pipkin also happened to be a personal friend of Rady's and Warren's. Lehman was to receive a fee for issuing its fairness opinion, as well as a percentage of transaction value. The percentage Lehman was to receive was lower for the $19 deal with Marathon than it would have been for a higher value transaction with another party. Nonetheless, the lower percentage provided Lehman with $3 mil-

lion for a deal at the $19 level then on the table.

The next day, Rady contacted Cazalot and tried to get Marathon to go to $20 a share, or at least to $19.50. Cazalot refused, stating that $19 was Marathon's "absolute, final best, top offer" and that they could "not go even a penny above $19 a share." [12] Rady then relented and agreed to recommend that price to his board.

Pennaco held a board meeting that day. Lehman was authorized to begin work on a fairness opinion as a prelude to any formal board action on the $19 price. The board also discussed with outside counsel its fiduciary duties and issues relating to the opportunities for a post-agreement "market check."

### Lehman Issues Its Fairness Opinion And An Agreement With Marathon Is Finalized

On December 22, 2000, the Pennaco board met to hear an oral presentation from Lehman regarding its fairness opinion. Lehman's presentation to the board displayed several different ways of valuing Pennaco's equity, including trading price, comparable companies, comparable acquisitions, and NAV calculations.

The Lehman analysis showed that the Marathon offer looked quite attractive in comparison to Pennaco's historical trading price:

---

10. Rady 183.

11. Vinson & Elkins was also retained as outside counsel.

12. Rady 184.

| Date | Price | Offer Price Premium / (Discount)[13] |
|------|-------|------------------------------------|
| December 19, 2000 | $15.25 | 24.6% |
| 10-day trading average | $14.12 | 34.6% |
| 20-day trading average | $13.33 | 42.6% |
| 30-day trading average | $13.18 | 44.2% |
| 60-day trading average | $13.84 | 37.2% |
| Avg. since January 1, 2000 | $13.28 | 43.1% |
| Avg. since public (7/1/98) | $9.54 | 99.2% |

This analysis was more significant because Pennaco had typically traded in the top quartile of gas companies. The comparable companies and acquisition analyses also tended to confirm the fairness of the $19 offer.

Lehman's NAV was based on three different "base cases" ranging from a very conservative case to a less conservative one. The Lehman NAV was based on the June 30 Reserve Report. In preparing its fairness analysis, Lehman had requested updated reserve information,[14] but had been told that no reliable updated information existed.[15] It is undisputed that Lehman was never shown the Warren E–Mail or the Warren NAV.

The Lehman NAV's most aggressive case produced a range of value of $15.14 to $18.89 a share. That is, Lehman's most aggressive case produced a high value lower than the lowest value in the Warren NAV. These differences are accounted for by, among other things, Lehman's use of more conservative assumptions of the value of different asset categories. For example, Lehman valued the unevaluated land at $100–$150 an acre, a value less than Pennaco's recent purchase prices and a value less than the $200 figure used in the Warren E–Mail.

At the end of its presentation, Lehman issued its oral opinion that $19 a share was a fair price. The Pennaco board then voted to formally approve a sale at that price as fair and in the best interest of Pennaco's stockholders.

*Pennaco Negotiates For Minimal Deal Protections So As To Ensure That There Will Be A Post–Agreement Market Check*

As of December 22, 2000, Pennaco had done nothing to see whether other buyers might exist. But Pennaco did negotiate for itself a relatively non-restrictive no-shop clause in the merger agreement. That clause permitted Pennaco to talk and provide information to any party that could reasonably be expected to make a superior offer that could be consummated without undue delay.

Furthermore, Pennaco had resisted Marathon's request for a termination fee equal to 5% of the value placed on Pennaco's equity in the transaction, and had settled on a termination fee at the more traditional level of 3%.[16] The merger

13. Pipkin Ex. 5 at 3.

14. Rady Ex. 22.

15. Lehman had recommended that Pennaco update its reserve estimates at the time of its engagement. Pipkin Ex. 4. Pennaco did not do so.

16. The termination fee was a slightly smaller percentage of the value of the combined equity and debt of Pennaco as measured by the transaction price. While Delaware cases have tended to use equity value as the benchmark for measuring a termination fee, no case has squarely addressed which bench-

agreement was otherwise devoid of impediments to a higher bid.

As another assurance that a post-agreement market check would exist, Pennaco obtained an agreement that Marathon would not commence its tender offer until the second week of January, 2001. This breathing room was designed to give potential bidders time to examine the transaction, get over any holiday reveries, and make a competing bid.

At the close of business December 22, 2000, Pennaco announced the transaction by press release. Pipkin of Lehman Brothers got edgy at the time of the release and made phone calls to a list of industry players who he believed might be inclined to make a topping bid. Pipkin did so without Pennaco's knowledge and in arguable violation of the no-shop clause.

On December 27, 2000, Pennaco filed a form 8–K with the merger agreement and December 22, 2000 press release as exhibits. These documents gave the marketplace knowledge of Pennaco's ability to speak with rival bidders and the standard nature of the termination fee.

### Marathon Commences Its Offer And Pennaco Files Its Schedule 14D–9

On January 8, 2001, Marathon formally commenced its tender offer. The same day Pennaco filed its Schedule 14D–9 (the "14D–9") recommending that Pennaco's stockholders tender into the offer. The 14D–9 contained a list of the reasons the Pennaco board supported the transaction that were written in the typically oblique style of such documents, but which boiled down to the board's belief that $19 was an extremely favorable price at which to sell the company.

The next day, lawsuits challenging the transaction were filed in this court. The parties agreed that the matter should be heard on an expedited basis. A February 1 hearing date was set and expedited discovery ensued.

In advance of the hearing, Pennaco supplemented the 14D–9 with additional disclosures that provide a detailed explanation of the various valuation analyses underlying Lehman's fairness opinion. The supplement did not, however, disclose the Warren NAV or the Warren E–Mail.

### II. An Overview Of The Plaintiffs' Claims

The plaintiffs take aim at several aspects of the transaction. As an initial matter, they point out that the Pennaco directors are recommending the sale of the company for cash. In this context, the Pennaco directors therefore undertook the duty to obtain the highest value reasonably obtainable for Pennaco's shares, and bear the burden under the *Revlon* standard [17] to demonstrate that they acted in a manner reasonably calculated to accomplish that end.

The plaintiffs contend that the Pennaco directors' decision to focus exclusively on Marathon and not to seek out other bidders was not a reasonable one. This failure, plaintiffs assert, cannot be cured by a post-market check occurring in the midst of holiday distractions – especially a market check hampered by the termination fee.

Furthermore, the plaintiffs argue that the Pennaco board was a cozy one dominated by defendants Rady and Warren, who had interests adverse to those of the other Pennaco stockholders. According to the plaintiffs, Rady and Warren intention-

---

mark is appropriate. Each benchmark has analytical arguments in its favor.

**17.** *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986).

ally dressed the company up for sale while stocking their own larders with options and enhanced severance packages. These emoluments gave Rady and Warren an incentive to lock in a deal that could be closed at less than the best price, because it was to their unique benefit to secure a solid price that would accelerate their options and guarantee them immediate severance benefits over five times more lucrative than their total compensation for the year 2000. If they pushed Marathon too hard for a good price, they could endanger their lucrative severance packages. Better for Rady and Warren, plaintiffs suggest, to lock in a good deal and their severance, than to risk their severance by seeking the best deal available. In addition, the plaintiffs also insinuate that the substantial increase in severance to Rady and Warren materially reduced the consideration a potential acquiror would pay for Pennaco's shares.

The plaintiffs also contend that the transaction should be preliminarily enjoined because the 14D–9 fails to set forth certain material facts. In particular, the plaintiffs contend that the 14D–9 is deficient because it fails to disclose the Warren E–Mail's statements regarding Pennaco's reserves and land value, and the Warren NAV.

### III. *Legal Analysis*

#### A. *The Relevant Procedural Standard*

 To obtain a preliminary injunction, the plaintiffs must demonstrate: (1) a rea-

sonable probability of success on the merits; (2) that they will suffer irreparable injury if an injunction does not issue; and (3) that the harm the plaintiffs will suffer absent an injunction outweighs the harm to the defendants that will result from the injunction.[18] A preliminary injunction is a powerful remedy that must be earned,[19] and this court is cautious about using that remedy where it might endanger or delay stockholders' receipt of a control premium in a situation where no competing bid has emerged.[20]

#### B. *Have The Plaintiffs Demonstrated A Probability Of Success On The Merits?*

*Have The Plaintiffs Shown That It Is Likely That The Pennaco Board Of Directors Failed To Carry Out Their Fiduciary Duty To Secure The Transaction Offering The Best Value Reasonably Available?*

The Marathon Transaction is a transaction that, if consummated, will result in the sale of all of Pennaco's stock from its current stockholders to Marathon in exchange for cash. Thus, it is an end-game transaction that represents the final opportunity for Pennaco's stockholders to realize value from their investment in the company.

[2] Because the Pennaco directors undertook a strategy that involved the sale of the company, they concomitantly focused their own fiduciary duties in a legally and

**18.** *Revlon*, 506 A.2d at 179.

**19.** *Golden Cycle, LLC v. Allan*, Del.Ch., C.A. No. 16301, 1998 WL 892631, at *11, Lamb, V.C. (Dec. 10, 1998).

**20.** *E.g.*, *Kohls v. Duthie*, Del.Ch., C.A. No. 17762, mem. op. at 30, Lamb, V.C., 765 A.2d 1274 (Dec. 11, 2000); *McMillan v. Intercargo Corp.* (*"Intercargo I"*), Del.Ch., C.A. No. 16963, mem. op. at 11, Jacobs, V.C., 1999 WL

288128 (May 3, 1999); *TCG Secs., Inc. v. Southern Union Co.*, Del.Ch., C.A. No. 11282, mem. op. at 27–28, Chandler, V.C., 1990 WL 7525 (Jan. 31, 1990); *In re Wheelabrator Technologies, Inc. S'holders Litig.*, Del.Ch., Cons.C.A. No. 11495, mem. op. at 20–21, Jacobs, V.C., 1990 WL 131351 (Sept. 6, 1990); *Solash v. Telex Corp.*, Del.Ch., C.A. Nos. 9518, 9525, 9528, mem. op. at 4, Allen, C., 1988 WL 3587 (Jan. 19, 1988).

practically consequential manner. Having decided to sell the enterprise, the directors became charged with the fiduciary responsibility to attempt to get the best price. As our Supreme Court has put it:

> In the sale of control context, the directors must focus on one primary objective–to secure the transaction offering the best value reasonably available for the stockholders–and they must exercise their fiduciary duties to further that end.[21]

■ The sale of control context also invokes a specific form of enhanced judicial review that involves two "key features":

(a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and

(b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing. The directors have the burden of proving that they were adequately informed and acted reasonably.[22]

■ In applying this standard, the court must be mindful that its task is to examine whether the directors have undertaken reasonable efforts to fulfill their obligation to secure the best available price, and not to determine whether the directors have performed flawlessly:

> Although an enhanced scrutiny test involves a review of the reasonableness of the substantive merits of a board's actions, a court should not ignore the complexity of the directors' task in a sale of control. There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of di-

rectors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.[23]

■ For several reasons, I conclude that the plaintiffs do not have a reasonable probability of ultimate success on their so-called *Revlon* claim. While one would not commend the Pennaco board's actions as a business school model of value maximization, the process the directors used to sell the company cannot be characterized as unreasonable.

The board's actions must be evaluated in the context of Pennaco's market posture. Even the plaintiffs concede that Pennaco was a source of industry interest. The company was followed by reputable analysts. The company communicated with the market in a bullish manner, and freely communicated with interested parties. The company had done an extensive search for a joint venture partner in 1998, which brought it to the attention of twenty to thirty industry players. Not only that, the company had reincorporated in Delaware to facilitate its participation in the mergers and acquisitions market.

---

**21.** *Paramount Comm., Inc. v. QVC Network, Inc.* ("*QVC*"), Del.Supr., 637 A.2d 34, 44 (1994).

**22.** *QVC,* 637 A.2d at 45.

**23.** *Id.* (citations and emphasis omitted).

As important, the Pennaco board's knowledge of the company has not been seriously challenged. The board is comprised of members with relevant expertise and experience in the energy business, and who had grown a start-up energy business impressively in a short period of time. There is no basis to believe that the board itself did not have a sound basis to evaluate the price at which a sale of the company would be advantageous.

In these circumstances, the court cannot say that it was unreasonable for the Pennaco board to deal with Marathon on an exclusive basis. Marathon was a major industry player with great financial clout. As all of the investment banks seeking Pennaco's business pointed out, there is no risk-free approach to selling a company, and dealing with one bidder at a time has its own advantages. Thus, the mere fact that the Pennaco board decided to focus on negotiating a favorable price with Marathon and not to seek out other bidders is not one that alone supports a breach of fiduciary duty claim.[24]

Nor does the record support the inference that the Pennaco board's negotiating strategy was unreasonable and perfunctory. To the contrary, the record suggests that Rady and Warren bargained hard to get a favorable price. They succeeded in obtaining a $2 per share increase in Marathon's initial offer, but were unable to get any offer over $19. Given what Rady knew about the company and the information contained in the pitch books from Lehman and CSFB, his decision to recommend that price to his board subject to a formal fairness opinion from Lehman is not a seriously litigable quibble.

Likewise, the court is unpersuaded by the plaintiffs' argument that the Pennaco board should have obtained an updated reserve report to justify a higher price. To conclude that the board's decision not to do so and instead to bargain based on the June 30 Reserve Report was unreasonable would involve second-guessing of the kind *QVC* proscribes.

The plaintiffs, of course, place heavy weight on the timing of Lehman's involvement and the fact that it entered the fray after the shooting had stopped. That chronological fact is true, but depends for its legal force on the assertion that a board must use an outside advisor to negotiate price and cannot do so itself on an informed basis. While there is case law that might be read as suggesting that a board's knowledge of the value of its own business is not sufficient,[25] the more traditional view is that an informed board is, of course, free to manage a corporation in all its aspects.[26] It is unlikely the court will later conclude that it was unreasonable for Pennaco's

---

**24.** *Barkan v. Amsted Industries, Inc.*, Del. Supr., 567 A.2d 1279, 1287 (1989) (when "directors possess a body of reliable information with which to evaluate the fairness of a transaction, they may approve [a] transaction without conducting an active survey of the market"). Cf. *McMillan v. Intercargo Corp.* ("Intercargo II"), Del.Ch., C.A No. 16963, 2000 WL 516265, at *9, Strine, V.C. (Apr. 20, 2000) ("Whether it is wiser for a disinterested board to take a public approach to selling a company versus a more discreet approach relying upon target marketing by an investment bank is the sort of business strategy question Delaware courts ordinarily do not answer.").

**25.** *See Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985).

**26.** *See, e.g., In re Formica Corp. Shareholders Litig.*, Del.Ch., Cons.C.A. No. 10598, mem. op. at 32–33, Jacobs, V.C., 1989 WL 25812 (Mar. 22, 1989) (holding that directors were capable of assessing the fairness of a transaction based on their own knowledge); *Chesapeake Corp. v. Shore*, Del.Ch., C.A. No. 17626, 2000 WL 193119, at *31, Strine, V.C. (2000) (board possessed sufficient knowledge to determine that an offer was inadequate).

board to conclude price negotiations, subject to confirmation from Lehman that the tentatively-fixed $19 price was fair.

On the other hand, there is little doubt that the validity of the Pennaco board's decision to proceed in the manner it did would be subject to great skepticism had the board acceded to demands to lock up the transaction from later market competition. That is, if the merger agreement with Marathon contained onerous deal protection measures that presented a formidable barrier to the emergence of a superior offer, the Pennaco board's failure to canvass the market earlier might tilt its actions toward the unreasonable.

But it appears that the Pennaco board was careful to balance its single buyer negotiation strategy by ensuring that an effective post-agreement market check would occur. The merger agreement's provisions leave Marathon exposed to competition from rival bidders, with only the modest and reasonable advantages of a 3% termination fee and matching rights. The plaintiffs' attack on the termination fee's level is make-weight and at odds with precedent upholding the validity of fees at this level.[27]

The board also retained significant flexibility to deal with any later-emerging bidder and ensured that the market would have a healthy period of time to digest the proposed transaction. As such, no substantial barriers to the emergence of a higher bid existed. Indeed, the fact that no higher bid has come forth in these circumstances is itself "evidence that the directors, in fact, obtained the highest and best transaction reasonably available."[28]

Finally, it is worth noting that the board had information that suggested that the Marathon offer was highly attractive from a financial point of view. Putting aside the formal valuation techniques that support this inference, the price's relationship to Pennaco's prior trading history buttresses this conclusion. Although Pennaco was a company that enjoyed favorable market treatment from the get-go, the Marathon offer exceeded the company's all-time trading high by nearly 10% and presented a healthy premium to all relevant benchmarks.

For all these reasons, I conclude that the plaintiffs are not likely to succeed on their *Revlon* claim.[29]

*Are The Plaintiffs Likely To Prove That The Board Placed Its Self–Interest Ahead Of Its Duty To The Pennaco Stockholders?*

■ The plaintiffs argue that what really motivates the Pennaco directors is their

---

27. *Intercargo II*, 2000 WL 516265, at *10 ("it is difficult to see how a 3.5% termination fee would have deterred a rival bidder who wished to pay materially more . . ."); *see also Matador Capital Management Corp. v. BRC Holdings, Inc.*, Del.Ch., 729 A.2d 280, 291–92 n. 15 (1998) (stating that fees in this range are generally considered reasonable); *Goodwin v. Live Entertainment, Inc.*, Del.Ch., C.A. No. 15765, 1999 WL 64265, at *23, Strine, V.C. (Jan. 25, 1999) (same).

28. *Matador*, 729 A.2d at 293.

29. It is unlikely that the board's decision-making process was hindered by the failure of directors Warren and Rady to share certain

information with the full board or Lehman. This information – the Warren E–Mail and the Warren NAV – is discussed later when I address plaintiffs' later disclosure claim. Because there is no reason to believe that this non-disclosure compromised the board's deliberations or Lehman's valuation analysis, I address it as a disclosure violation only. I am also dubious about plaintiffs' assertion that the information rendered the post-agreement market check illusory. It is hard to imagine that sophisticated purchasers needed additional information to inspire a topping bid, in view of the information already available about Pennaco's production potential. *See, e.g.*, Rady Exs. 3, 4, 5, 11, 13, 25, 34.

desire to lock in a profit on their shares and to immediately receive valuable Change In Control Severance. They contend that Rady and Warren intended to sell Pennaco in 2000 and made sure that they were personally loaded with options and Change In Control Severance that would allow them to capture an unfair portion of Pennaco's value in a sale of the company and retire as rich men if they wished.

In support of this contention, the plaintiffs point to the fact that only one of the directors of Pennaco, director Lanza, did not derive valuable benefits [30] from his relationship with the company. Rather than see the Pennaco board as a tight-knit board comprised of substantial equity holders who are highly knowledgeable in the energy business, the plaintiffs view the board as a bunch of cronies happy to get out when the going was good for them.[31]

The plaintiffs also note that the process by which the Pennaco board set executive compensation was not one that would be applauded by commentators who believe that independent, non-management directors should take the lead on such matters. Although Pennaco had a compensation committee, that committee appears to have met only at brief intervals in the middle of board meetings. It was content to let management take the laboring oar on proposing compensation arrangements. Indeed, it was Rady and Warren who worked with Arthur Andersen, not the compensation committee.

Although the plaintiffs' arguments have obvious color, the plaintiffs have not convinced me that they are likely to succeed in proving that the options and new em-

ployment agreements granted to board members in the year 2000 were the product of a breach of fiduciary duty. Historically, Delaware courts have been quite reluctant to second-guess compensation decisions made by boards,[32] even though those decisions always can be seen as clubby, or even as blatantly self-interested. ·

Candidly, the defendant-directors' adamant insistence that the timing of the amendments to Rady's and Warren's employment agreements had nothing to do with Marathon's interest and a possible imminent sale of the company strikes me as implausible. Perhaps I am overly cynical, but this Mayberry R.F.D. view of the business world is hard to accept. Here, plaintiffs also have the advantage of attacking a board that failed to use procedural protections to diminish the possibility that self-interest would taint its compensation decisions. For example, the November 15 changes to Rady's and Warren's agreements were recommended by Warren himself, and were voted on by a board majority comprised of Rady, Warren, and director Gibson, who himself was the beneficiary of similar changes.

Even so, other facts lead me to conclude that the plaintiffs have not met their burden. For starters, the record supports the inference that the board was examining changes in compensation policy long before Marathon came along. The changes made to executive compensation at the July 28, 2000 meeting were consistent with the changes later made to Rady's and Warren's packages. I am skeptical of plaintiffs' insinuation that Rady's and Warren's discussions with Arthur Andersen were

---

**30.** Other than directors' fees and relatively modest number of options.

**31.** I note that this theory suggests that the legal fees that Petersen's law firm received from Pennaco were not important to him,

because those fees are obviously endangered by the sale of the company.

**32.** *See, e.g., Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000).

designed to provide cover for a secret plan to load up their Severance in advance of a pre–2001 sale of the company.

As important, there appears to have been a non-pretextual business rationale for the changes that were made. The plaintiffs have not disputed that the tax ramifications of the existing Change In Control Severance packages were severe, both to the executives who possessed those packages and any acquiror. Given the strong performance of the company, it was hardly outrageous to think that the board would reward its management with gross-up protection[33] and increased Change In Control Severance in exchange for a non-compete, especially when the cost of the increased Severance would be at least partially offset by the tax protection gained thereby.

Similarly, the board's grant of options to itself on July 28, 2000 was consistent with a policy of aligning the board's interests with those of the stockholders. This is a permissible purpose. And if the board were looking out only for itself, it is unclear why it granted more options to non-director employees on July 28 than to itself. Likewise, if the board knew it was going to sell the company and wished to gorge, it is not apparent why it left over 400,000 options unissued.

Moreover, although I incline towards the view that the November 15 changes were made *when* they were because of the serious possibility of a change in control, I am unconvinced that the Pennaco board believed such a transaction was imminent. Other suitors had flirted with Pennaco, but none had made a binding offer.

While there is no question that the Change In Control Severance available to Rady and Warren had to influence their assessment of an offer in some manner, it is implausible to infer that they were willing to sell at any price whatsoever. Rady and Warren were two of the company's largest stockholders. Although their Change In Control Severance might conceivably have influenced them not to risk the loss of a very good price in hopes of receiving a great price, it is unlikely that they were going to jump at a sub-par offer just to get their Severance. It is even more unlikely that they were sure that Pennaco was going to be sold on November 15 when Marathon had not even made an offer.

Candor requires me to also acknowledge my reluctance to buttress an injunction on claims that are relatively insubstantial in relation to the overall transaction at issue.[34] Here, the increased value to Rady and Warren from the Change In Control Severance increase they received in the year 2000 amounts to approximately 1% of the total transaction value, and pales in comparison to the benefits they will receive from the sale of the stock they owned before 2000.[35] So-called "golden parachute" payments serve the purpose of reducing the natural resistance of employees

---

**33.** As the board was advised by Arthur Andersen, such protection is hardly uncommon. *See, e.g., Hills Stores Company v. Bozic,* Del. Ch., C.A. Nos. 14527, 14460, 14787, 2000 WL 238007, Strine, V.C. (Feb. 22, 2000).

**34.** The board was advised by Arthur Andersen that the changes would not be an impediment to a purchaser. I note, however, that the record reflects that Marathon apparently gave some thought to seeking to undo the changes in the negotiations.

**35.** The options and gross-up protection they received in 2000 adds nearly another percentage point. But the plaintiffs' challenge to the options is very weak, as is their challenge to the gross-up protection. And the record reflects that the non-competes were designed to minimize the risk that any gross-up taxes would be imposed, a minimization that the parties have not valued.

to change in control transactions that might disrupt their employment. They grease the skids for sales transactions beneficial to stockholders. When the court has little basis to believe that the existence of these payments reduced the per share price offered to the stockholders, it is advisable for it to be cautious about using the existence of such payments as the underpinning for an injunction depriving the stockholders of the opportunity for a premium.[36]

### Is There A Reasonable Probability That The Pennaco Directors Have Failed To Disclose All The Material Facts?

■ Because the Pennaco directors are asking the Pennaco stockholders to tender into Marathon's offer, they are required to disclose fully and fairly all material information within their control.[37] The plaintiffs contend that the 14D–9 fails to set forth several material facts. In view of the lack of strength of plaintiffs' other disclosure claims, I focus solely on the plaintiffs' arguments centering on the nondisclosure of the Warren E–Mail and the Warren NAV.[38]

As to those documents, the plaintiffs assert that the stockholders have the right to know that Pennaco's CFO and director:

(1) estimated that the company's proven reserves would increase from the June 30, 2000 levels, that the company's probable and possible reserves would increase by 400 billion cubic feet ("bcf"), or nearly 35%; and that the value of the company's unexamined acreage was $200 an acre on a conservative basis; and

(2) performed an NAV valuing Pennaco at $21.23 to $24.93 per share based on Pennaco's June 30, 2000 reserves.

The strength of this claim has been more than typically difficult for the court to assess, for reasons that are not the fault of the plaintiffs. The court lacks full confidence that the record allows it to accurately determine whether Warren's assessment of Pennaco's reserves and NAV as of December, 2000 reflected responsible and well-considered views of those matters, or simply aggressive bargaining statements that lack a solid foundation.

The record, however, is clear that one of the principal determinants of Pennaco's

---

**36.** Admittedly, these points may be more properly addressed to the irreparable harm and equitable balancing prongs of the preliminary injunction test.

**37.** *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 84 (1992).

**38.** The plaintiffs' other disclosure claims do not merit extended treatment. None seems likely to be sustained after a final hearing. For example, the plaintiffs contend that the 14D–9 fails to disclose the reasons motivating the Pennaco's board recommendation of the transaction. Yet, the 14D–9 gives a lengthy list of reasons supporting the board's recommendation, a list that distinguishes this case from those in which a board has given no information at all to stockholders to buttress their recommendation.

The plaintiffs also claim that the 14D–9 does not adequately describe the connection between the changes in Rady's and Warren's compensation and the transaction. The 14D–9, however, does describe the benefits that Rady and Warren will receive. The plaintiffs wish the 14D–9 to admit to a self-flagellating causal link the defendants do not concede. *Loudon v. Archer–Daniels–Midland Co.*, Del. Del.Supr., 700 A.2d 135, 143 (1997). And the addition of a statement regarding the timing of the change is not, in my view, a material addition to the information mix.

Likewise, the 14D–9's failure to disclose what the board "did not do" does not support a disclosure claim. *Goodwin*, 1999 WL 64265, at *20. The inference a reader draws from the lack of a statement in the 14D–9 that the Pennaco board sought out other bidders is obvious: the Pennaco board did not seek out other bidders.

value as a company is its ability to produce natural gas. The amount and quality of the company's assets (in particular, its proven and probable reserves) are important indicators of such capacity. To the extent that Warren had a reliable basis, for example, to believe that Pennaco's probable/possible reserves had increased by over 400 bcf since June 30, there is little doubt that this information would be material to both a stockholder and to Lehman in performing its own NAV.[39] In fact, Lehman itself had asked to be provided with updated reserve information and had suggested that the company consider retaining a third-party to produce a current reserve report.

In the past, Delaware courts have also required boards to disclose responsible NAV calculations in their possession, even when some of those calculations reflected a more optimistic view than the board itself believed to be sound. As the Delaware Supreme Court said in a case also involving an energy company whose energy reserves were a key determinant of its value:

> [W]hen, as here, management was in possession of two estimates from reliable sources—one using a "floor" approach defining value in terms of its lowest worth, and the other a more "optimistic" or ceiling approach defining value in terms of its highest worth—it is our opinion that complete candor required disclosure of both estimates. If management believed that one estimate was more accurate or realistic than another, it was free to endorse that estimate and to explain the reason for doing so; but full disclosure, in our view, was a prerequisite.[40]

The problem that both the court and the plaintiffs faced as of the time of the preliminary injunction hearing was the lack of any basis to determine whether Warren's reserve estimates and NAV are reliable. But that problem was one that was caused by Warren himself and the Pennaco directors.

Without attempting to ascribe blame to anyone in particular, the fact is that the Warren E–Mail and the Warren NAV were not disclosed to the plaintiffs until after the initial deposition discovery in the case was finished and the plaintiffs were in the final stages of preparing their opening brief. As such, the plaintiffs had no opportunity before oral argument to cross-examine Warren about these documents and to determine the basis for the opinions he expressed therein.

The failure to produce these documents earlier is rendered all the more suspect by Warren's January 22, 2001 deposition testimony on the subject of Pennaco's reserves. Contrary to his assertions to Marathon that he expected that Pennaco's proven reserves would increase and that Pennaco's probable/possible reserves would increase by 400 bcf, Warren's testimony on the subject of reserves read as follows:

---

**39.** *Joseph v. Shell Oil Co.*, Del.Ch., 482 A.2d 335 (1984) (majority stockholder's failure to provide the company's investment banker with non-public, material information about the company's probable oil and gas reserves constituted a breach of fiduciary duty and the failure to disclose the withholding of this information rendered the disclosures to the stockholders defective).

**40.** *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278, 281 (1978); *see also Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 712 (1983) (holding that a report generated by directors of a subsidiary affiliated with the majority stockholder which indicated that it was attractive for the majority stockholder to acquire the minority's stock at a price up to $24 a share should have been disclosed to the stockholders and to the investment bank representing the subsidiary); *Joseph*, 482 A.2d 335.

Q. You understood that the [Lehman] proved reserves valuations were based upon proved reserves as of June 30, 2000, correct?

A. Correct.

Q. Did you discuss with Lehman the fact that the amount—the value derived from proved reserves as reflected in this page could be increased if they used a date subsequent to June 30 to value those reserves?

A. No, because we also understood that they could be decreased.

Q. Did you think it was more likely than not that the reserve value would increase—I'm sorry—would decrease after June 30?

A. I don't know.

Q. In fact, the amount of the reserves increased significantly—proven reserves increased significantly from January 1, 2000, to June 30, 2000, didn't they?

A. Yes, there was a large increase.

Q. And as of December 22, did you have some reason to believe that there would be a decrease in the value of proved reserves after June 30?

A. No way of knowing. The past is no predictor of the future as to reserve calculations.

Q. Did you, as a result of you being the chief financial officer of the company, have no idea whether the amount of proved reserves as of December 22, 2000, was the same or different from what it was as of June 30, 2000?

A. Absolutely no way of knowing.

Q. Was there any way of knowing—did anyone at the company have any way of knowing that?

A. Not to my knowledge.

Q. Absolutely no way of figuring that out?

A. Not to my knowledge.[41]

In an affidavit filed on the eve of oral argument, Warren predictably described his E–Mail and NAV as aggressive, non-reliable assertions intended to extract a good price from Marathon. For its part, Marathon said – quite plausibly – that it did not rely upon Warren's assertions or NAV assumptions but upon more solid information. Lehman chimed in that it had full access to Pennaco's production executives and suggested that it had confidence that it ascribed reliable value to Pennaco's assets, even in the absence of its receipt of the Warren E–Mail and the Warren NAV. While it acknowledges that increases in reserves of the magnitude suggested by the Warren E–Mail would move the range of its NAV calculation, it insists that the movement would be immaterial.

The fact that the plaintiffs had not had the chance to inquire about any of these issues was disturbing. Most important, it was difficult to give credence to Warren's affidavit in view of his remarkable January 22, 2001 deposition testimony. Given the existence of his E–Mail, one would have expected testimony that went something like this: "I'm not certain what our current reserves are. I am optimistic that our proven resources will increase and I expect a sizable increase in our probables in the next year or so. In fact, I tried to convince Marathon that we would see increases in those categories. At the end of the day, however, you just can't be sure until you get a final reserve report." Instead, Warren's testimony suggests that the top managers of gas companies simply have no idea in what direction their reserves are headed.

Had the record remained as it was at the time of oral argument, it would have been difficult to conclude that the Warren E–Mail had no basis. After all, on December 10, Pennaco was at a critical stage in

**41.** Warren 93–94.

its negotiations. The law presumes that businessmen like Warren act rationally. Pushing an optimistic scenario on a potential buyer is to be expected; shoveling pure blarney at that stage is another. It was hard to believe that Warren simply picked a modest 35% increase in Pennaco's probable/possible reserves out of the ether or whimsically described a $200 per acre land value as "conservative." Furthermore, Pennaco had been able to generate an internal update at mid-year, which showed an extremely large 93% increase in its proven reserves. It had confidence enough in this estimate to publicly announce it.[42]

Adding to my disquietude was Marathon's production of two pages of a pitch book that it had received from Pennaco in November, 2000. These pages were also produced after deposition discovery had concluded. The pages were omitted from the version of the pitch book earlier produced to the plaintiffs by Pennaco.[43]

The two pages also relate to the value of Pennaco's assets. One of the pages contains an NAV. Admittedly this NAV is highly aggressive and clearly unreliable. But its non-production was unsettling in view of Pennaco's failure to timely produce the Warren E–Mail and the Warren NAV.

More concerning was the second omitted page. That page suggests that Pennaco had obtained a preliminary reserve report on some of its properties as of November 1, 2000 for use in securing financing.

The unsatisfactory state of the record created a quandary. Had Warren's deposition testimony been more reconcilable with his prior E–Mail, the court would have tended to give the defendants the benefit of the doubt. For the benefit of stockholders, it is important that directors be able to produce extremely optimistic valuation scenarios for potential buyers in order to induce favorable bids. The law of disclosure should not deter aggressive negotiations by requiring the disclosure of valuations intended solely as sales pitches, and not as responsible estimates of a company's value. Delaware case law reflects this concern and has refused to require the disclosure of bargaining "puff pieces." [44] Our case law has similarly reflected a reluctance to require the disclosure of soft information that lacks sufficient guarantees of reliability.[45]

But absent further record evidence, inferring that the Warren E–Mail and the Warren NAV were immaterial would have made the plaintiffs bear the burden of uncertainty caused by the defendants' own discovery failures. Because the Warren E–Mail and the Warren NAV touch on important questions of value, the equities may have demanded disclosure based on the then-extent record. This approach was less than satisfying, however, because it exposed the Pennaco stockholders to

**42.** Rady Ex. 11.

**43.** This opinion should not be read as ascribing any improper motive to these failures in timely production. The court recognizes that such events occur in cases like this, even when all precautions have been taken to ensure prompt and thorough production. Regardless of motive, however, the Pennaco defendants must accept responsibility for the unsatisfactory state of the record.

**44.** *Rand v. Western Air Lines, Inc.*, Del.Ch., C.A. No. 8632, mem. op. at 3, 16, Berger, V.C., 1994 WL 89006 (Feb. 25, 1994), *aff'd*, Del.Supr., 659 A.2d 228 (1995); *Snyder v. Convergent, Inc.*, Del.Ch., C.A. No. 10236, 1988 WL 143009, at *2, Hartnett, V.C. (Dec. 21, 1988) (same rationale).

**45.** *See, e.g., Goodwin*, 1999 WL 64265, at *13; *In re Vitalink Comm. Corp. Shareholders Litig.*, Del.Ch., C.A. No. 12085, mem. op., 1991 WL 238816, at **13–14, Chandler, V.C. (Nov. 8, 1991), *aff'd*, Del.Supr., 610 A.2d 725 (1992).

delay in exchange for the receipt of arguably unreliable information.

To address this problem, the court suggested that Warren be re-deposed. That occurred on Saturday, February 3 and the transcript was filed with the court late the next day. A close reading of the new deposition testimony of Warren persuades me that the plaintiffs are not likely to succeed on their claim that the Warren E–Mail and the Warren NAV contain material information that would be useful to a Pennaco stockholder in assessing whether to tender.

As to the increases in reserve estimates in the Warren E–Mail, Warren testified in a plausible manner about why he used the language he did and the basis for the substance of his statements regarding Pennaco's reserves. Without delving into his explanation in too much detail, Warren possessed information that allowed him to engage in a reasoned negotiation with Marathon in which he could advocate that he had a basis to be optimistic that: (1) Pennaco's reserves would increase; and (2) the unevaluated acreage of Pennaco could, once evaluated carefully, generate over 400 bcf of probable/possible reserves in the relatively near future and some amount of additional proven reserves in the long-term. Warren also had a basis to support his $200 per acre land value. In sum, Warren possessed enough of a basis for him to jawbone with a sophisticated purchaser about these items without looking foolish.

At the same time, his testimony also indicates his lack of any firm basis to believe that Pennaco's reserves were materially different as of December, 2000 than the publicly disclosed June 30 Reserve Report. Warren explained the retention of the outside consultant referenced in the missing page, and testified that the consultant's estimates were preliminary. Even more important, Warren said that the con-sultant's preliminary estimates did not differ materially from the June 30 Reserve Report.

Warren also explained the NAV contained in his E–Mail. The NAV was based on the June 30 Reserve Report. It uses aggressive assumptions, and fails to account for tax and other effects that he considers of material importance in conducting a reliable NAV. Warren testified that it was prepared exclusively to get Marathon to give adequate weight to Pennaco's assets, and that he expected that Marathon would apply its own subjective judgment to the harder aspects of the information contained in the NAV. Likewise, he explained his $200 per acre land value estimate as a plausible, but optimistic, value he used for bargaining purposes. He considers the $100 to $150 value used by Lehman as proper.

In view of the circumstances in which the Warren E–Mail and Warren NAV were created, Warren's deposition testimony impresses me as truthful. That impression results in my tentative conclusion that: (1) there had been no reliably documented, material changes in Pennaco's reserves from the June 30 Reserve Report as of December 2000, and (2) that the Warren NAV was simply a bargaining ploy that is not a reliable valuation of Pennaco's assets. Therefore, the failure of the 14D–9 to disclose the information related to these documents (as well as the missing pages) does not seem likely to be deemed wrongful.

I come to this conclusion with far less confidence than is optimal. Warren's initial deposition testimony remains difficult to fathom. Had he given the far more nuanced testimony typical of his second deposition at his first deposition, the court would be less hesitant to rely upon his word. Obviously, the late production of key documents also undermines the court's trust in the Pennaco directors' position.

And the court recognizes that the plaintiffs had little time to prepare for Warren's second deposition and that there still appear to be responsive documents that have not been produced.

Given these circumstances, I will not be surprised if, at a final hearing, the evidence demonstrates that the Pennaco stockholders were entitled to receive disclosures about the Warren E–Mail and the NAV. But despite the unusual events that have transpired, I conclude that the plaintiffs have not demonstrated a reasonability of success on the merits.

Because the plaintiffs have not made a sufficient merits showing, the court will not grant a preliminary injunction against the closing of the Marathon tender offer. After all, even when a sufficient merits showing is made by a plaintiff, this court is justifiably reluctant to enjoin a premium-generating transaction when no other option is available, except insofar as is necessary for the disclosure of additional information to permit stockholders to make an informed decision whether to tender.[46]

## IV. *Conclusion*

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied. IT IS SO ORDERED.

[46.] In view of the importance of Pennaco's reserves to its values and the confusion that has occurred in the discovery process, the plaintiffs have argued that an injunction should issue requiring Pennaco to obtain and disclose an updated reserve report. This, they say, would give the Pennaco stockholders reliable reserves information to consider and could also induce other bidders into the fray. Although not without a logical basis, this request would likely delay the close of the transaction well over a month. A delay of this magnitude could diminish the value of the $19 per share received by Pennaco stockhold-ers if the deal eventually closed, and would risk triggering Marathon's right to walk away. This sort of gamble would have to be justified by a very strong merits showing, which has not been made. The court is also unconvinced that other sophisticated energy companies lack the information they need to determine whether to make a topping bid, given the abundance of information that is publicly available about Pennaco and its potential. *See, e.g.,* Rady Ex. 13 (Pennaco press release forecasting a 102% to 123% increase in 2001 gas production and a 150% to 185% increase in cash flow in 2001).