**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 10374-VCG |
| ABBVIE INC., | ) ) ) | |
| Defendant. | ) ) ) | |
| JAMES RIZZOLO, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | C.A. No. 10408-VCG |
| ABBVIE INC., | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Date Submitted: February 11, 2015
Additional Submission: April 9, 2015
Date Decided: April 15, 2015

Pamela S. Tikellis, Robert J. Kriner, Jr., Scott M. Tucker, and Matthew T. Arvizu, of CHIMICLES & TIKELLIS LLP, Wilmington, Delaware; *Attorneys for Southeastern Pennsylvania Transportation Authority*.

Craig J. Springer and Peter B. Andrews, of ANDREWS & SPRINGER, LLC, Wilmington, Delaware; *Attorneys for James Rizzolo*.

Lisa A. Schmidt, A. Jacob Werrett, and J. Scott Pritchard, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; OF COUNSEL: Robert J. Kopecky, Sallie G. Smylie, P.C., and Christa C. Cottrell, of KIRKLAND & ELLIS LLP, Chicago, Illinois; *Attorneys for AbbVie Inc*.

**GLASSCOCK, Vice Chancellor**

The board of AbbVie, Inc. ("AbbVie" or the "Company") decided to pursue a merger with a Jersey entity,[1] Shire plc ("Shire"), in part to take advantage of favorable tax treatment of income that would result under the then-current interpretation of U.S. tax law as enforced by the Treasury Department. Like practically all decisions taken by corporate boards, that action involved risk. Here the risk—which proved substantial—was that the law, or its interpretation by regulators, would change before sufficient tax advantages could be realized to offset the costs to stockholders of the transaction. As it turned out, the Treasury's interpretation of applicable tax law changed in a way that eliminated the tax advantages of the merger before its consummation, and the board concluded that the Company would be better off withdrawing from the merger—and paying a substantial breakup fee—than proceeding.

The Plaintiffs here are AbbVie stockholders. They contend that the risk of loss of the tax advantages inherent in the merger with Shire was so substantial, and so obvious, that the directors must have breached their fiduciary duties to the stockholders by entering the deal. In these actions under Section 220, they seek to obtain records from the Company that will allow them to demonstrate this liability sufficiently to allow them to pursue a derivative action on behalf of AbbVie against the directors. Under the statute, they need only produce evidence

---

[1] That is, a company incorporated under the laws of Jersey, an island in the Channel Islands between England and France that is a semi-autonomous political entity.

demonstrating a credible basis that actionable corporate wrongdoing on the part of the directors has occurred, a notably low standard of proof designed to ensure that the costs and effort required to answer the demand for documents does not outweigh the potential advantage to the corporation and its stockholders of production. Notwithstanding this low standard, however, the Plaintiffs have failed to meet it here: They have shown only that the directors took a risky decision that failed at substantial cost to the stockholders. Evaluating risk is the *raison d'être* of a corporate director. These directors are insulated from liability for breaches of a duty of care, and the Plaintiffs have failed to establish a credible basis to believe that the directors have acted disloyally here—that is, were interested in the transaction, not independent, or were acting in bad faith. If the stockholders believe that the directors acted unwisely, they have a remedy in the corporate franchise, but these stockholders have failed to establish a credible basis on which to imply actionable corporate wrongdoing sufficient to confer a right to the records they seek.

## I. BACKGROUND FACTS[2]

*A. The Parties and Relevant Non-Parties*

Defendant AbbVie is a "global, research-based biopharmaceutical company," which since its spin-off from Abbott Laboratories in 2013 "has grown

---

[2] Citations to exhibits in the stipulated joint trial record appear as "JX." All pinpoint citations refer to the document's original pagination.

to become an approximately $86 billion market capitalization company with approximately 25,000 employees worldwide across over 170 countries and sales of nearly $19 billion in 2013."[3] AbbVie is a publicly-traded Delaware corporation with its principal place of business in North Chicago, Illinois.[4]

Non-party Shire is a "leading global specialty biopharmaceutical company that focuses on developing and marketing innovative specialty medicines."[5] Shire is a public limited company registered in the island of Jersey, a Crown Dependency of the United Kingdom, with its principal place of business in Dublin, Republic of Ireland.[6]

Plaintiffs Southeastern Pennsylvania Transportation Authority ("SEPTA") and James Rizzolo ("Rizzolo") were the beneficial owners of shares of AbbVie common stock at all times relevant to this dispute.[7]

*B. AbbVie Draws Up a Tax Inversion*

These coordinated actions to inspect certain corporate books and records of AbbVie pursuant to Section 220 of the Delaware General Corporation Law both arise from the highly publicized failed merger of AbbVie with Shire in late 2014 (the "Proposed Inversion"). The concept for the Proposed Inversion was born among AbbVie's senior management in 2013 as part of its ongoing and periodic

---

[3] JX 12 at 12.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] JX 1 at 1, Ex. A; JX 11, Ex. A.

review of the Company's business, which included "evaluation of potential opportunities for business combinations, acquisitions, and other financial and strategic alternatives."[8] In October 2013, AbbVie's senior management identified several companies, including Shire, as potential partners in a strategic transaction.[9] With the help of J.P. Morgan, AbbVie's senior management continued to internally evaluate potential transactions through the spring of 2014, with an increasing focus on a "significant strategic transaction" with Shire known as an "inversion."[10]

A corporate inversion is a corporate reorganization in which a company changes its country of residence by resituating its parent element in a foreign country.[11] Inversions are—or were—attractive as a strategic business maneuver because they allow a corporation to adopt a foreign country's more favorable tax or corporate governance regime.[12] In the past few decades, inversions have become especially popular among corporations domiciled in the United States, due to the United States' onerous—relative to that of many other countries—corporate tax code, under which a U.S. corporation must pay a relatively high tax (up to 35%) both on all income earned within U.S. borders and on income earned outside U.S.

---

[8] JX 12 at 48.
[9] *Id.*
[10] *Id.*
[11] JX 13 at 4.
[12] *Id.* at 1–2.

borders when that foreign income is repatriated to the domestic corporation.[13] Inversions' role in helping U.S. corporations avoid federal tax obligations has earned these transactions the moniker in this country of "tax inversions."[14]

Due to regulatory restrictions, which will be addressed below, the Proposed Inversion envisioned by AbbVie's senior management in late 2013 and early 2014 necessitated a partner like Shire, and would require a series of transactions and merger subsidiaries to take effect. In simplified terms, AbbVie was to form a wholly owned subsidiary under the laws of Jersey ("New AbbVie"), acquire Shire for mixed consideration of cash and New AbbVie common stock[15] (referred to by the parties as the "Arrangement"), and convert AbbVie common stock into New AbbVie common stock (referred to by the parties as the "Merger").[16] At the culmination of these transactions, AbbVie and Shire would each be indirect, wholly owned subsidiaries of New AbbVie—effectively expatriating AbbVie.[17]

---

[13] *Id.* at 2. To avoid double taxation on foreign income, the U.S. tax code offers U.S. companies a foreign tax credit, under which "tax due on repatriated income is reduced by the amount of foreign taxes already paid." *Id.*

[14] *See, e.g.*, JX 15.

[15] Units of equity ownership in a Jersey entity are referred to as "ordinary shares," but that term is synonymous with "common stock." For the sake of clarity, I refer to ordinary shares as "common stock" and holders of ordinary shares as "stockholders."

[16] For a detailed overview of the mechanics of the Proposed Inversion, see JX 12 at 65–66. AbbVie planned to use separate merger subsidiaries under New AbbVie to maintain Shire and AbbVie as independent entities under New AbbVie. *Id.*

[17] *Id.* at 65.

*C. AbbVie Successfully Woos Shire, the Reluctant Bride*

AbbVie's senior management first brought the Proposed Inversion to the Company's board of directors at a regular board meeting on February 20, 2014.[18] In the following weeks, the Company engaged with J.P. Morgan and AbbVie's U.S. and U.K. legal advisors to further analyze the transaction's strategic business and legal considerations.[19]  On April 7, 2014, AbbVie formally retained J.P. Morgan to serve as its financial advisor, in which capacity J.P. Morgan met with AbbVie's officers the next day to discuss "financial analyses, transaction considerations[,] and tactical considerations relating to a potential strategic transaction with Shire."[20]  On April 30, 2014, at a special board meeting, senior management communicated the "legal, financial, and other considerations" of the Proposed Inversion to AbbVie's board, which then granted senior management authorization to reach out to Shire with a non-binding, preliminary proposal for the transaction.[21]

With the board's blessing, in May 2014 AbbVie's Chief Executive Officer, Richard Gonzalez, began a lengthy back-and-forth courtship of Shire via its Non-Executive Chairman, Susan Kilsby.  At Gonzalez's request, the pair first met in Switzerland on May 5, where Gonzalez informed Kilsby of AbbVie's interest in a

---

[18] *Id.* at 48.
[19] *Id.*
[20] *Id.*
[21] *Id.*

strategic transaction and floated AbbVie's first proposal, valuing Shire at £39.50 per share.[22] On May 9, Kilsby notified Gonzalez that Shire's board had rejected the offer.[23] Gonzalez regrouped with AbbVie's board, senior management, and financial and legal advisors and submitted AbbVie's second bid days later on May 13, valuing Shire at £40.97 per share.[24] Following the second offer, J.P. Morgan reached out to Shire's financial advisors directly to discuss the terms, but to no avail; Shire's board rejected the second proposal on May 20.[25] Gonzalez floated a third proposal on May 30, valuing Shire at £46.26 per share, this time meeting in person with Kilsby and Shire's Chief Executive Officer in France to discuss the transaction, but on June 16 Shire's board rejected this proposal as well, indicating that AbbVie was still undervaluing Shire and that "continuing discussions at such an offer level would be a distraction for Shire['s] management team."[26] Shortly thereafter, the U.K. Panel on Takeovers and Mergers forced AbbVie and Shire to acknowledge press rumors of a potential transaction and reveal the details of AbbVie's overtures, requiring the parties to continue their previously private negotiations in the public light.[27]

---

[22] *Id.*
[23] *Id.* at 49.
[24] *Id.*
[25] *Id.*
[26] *Id.* at 49–50.
[27] *Id.* at 50.

Undeterred by the publicity or Shire's rebuffing, AbbVie rebounded with an additional series of proposals in July 2014. On July 8, AbbVie issued a press release announcing a fourth proposal, valuing Shire at £51.15 per share.[28] This proposal was sufficient to land the Company a private meeting with Shire executives to better evaluate the value of the transaction.[29] Following the meeting, Gonzalez submitted a fifth proposal to Kilsby on July 12, valuing Shire at £52.25 per share.[30] On July 13, Gonzalez and Kilsby met to discuss "the Fifth Proposal and closing conditions, break fees[,] and arrangements for Shire employees in a potential recommended transaction."[31] In light of that conversation, AbbVie's board authorized and extended a sixth proposal later that day, valuing Shire at £53.20 per share, which Kilsby indicated to Gonzalez "the Shire Board would be willing to recommend . . . subject to satisfactory resolution of the other terms" of the proposal.[32]

Representatives of both companies met in the following days to negotiate the transaction's "other terms," which included

> the conditions to the transaction, the process and timing of obtaining antitrust and competition clearances, *whether a break fee or other compensation payment would apply if the [Proposed Inversion] were not to be completed under various scenarios (including the AbbVie*

---

[28] *Id.* at 51.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*

*Board changing its recommendation or the AbbVie shareholders failing to approve the [Proposed Inversion])* and arrangements for Shire employees.[33]

On July 17, AbbVie's board held a special meeting to consider the final terms reached by the parties. After hearing from the Company's senior management and advisors, including J.P. Morgan, which rendered a fairness opinion in favor of the transaction on the agreed-upon terms,[34] AbbVie's board approved the Proposed Inversion and authorized Company officials to enter into a formal agreement with Shire.[35]

### D. Terms of the AbbVie-Shire Union

#### 1. Price and Structure

On July 18, 2014, AbbVie and Shire publicly announced the Proposed Inversion in a press release detailing the basic terms agreed upon by the parties (the "Announcement"): Shire's stockholders were to receive £24.44 in cash and be issued 0.8960 share of New AbbVie common stock per share of Shire common stock in the Arrangement, and shares of AbbVie common stock would be converted into shares of New AbbVie common stock at a one-to-one ratio in the Merger.[36] On these terms, the parties expected that, after the culmination of the

---

[33] *Id.* at 52 (emphasis added).

[34] J.P. Morgan gave an oral fairness opinion at the July 17 special meeting; the following day, J.P Morgan supplemented its oral opinion with a full written opinion, "which set[] forth the assumptions made, matters considered[,] and limits on the review undertaken." *Id.*

[35] *Id.*

[36] JX 6, Ex. 2.1, at 1–2.

Proposed Inversion, AbbVie's former stockholders would own approximately 75% of the New AbbVie common stock, and Shire stockholders would have received approximately £14.6 billion in the aggregate and own approximately 25% of the New AbbVie common stock.[37] The combined cash and stock consideration that AbbVie was to pay Shire's stockholders in the Arrangement priced Shire at approximately £32 billion, approximately $54 billion at the time the transaction was announced.[38]

### 2. The Pre-Nup: The Co-Operation Agreement and Reverse Termination Fees

The same day as the they released the Announcement, AbbVie and Shire executed an agreement "set[ting] out certain mutual commitments to regulate the basis on which [the parties were] willing to implement the [Proposed Inversion]" (the "Co-Operation Agreement").[39] The Co-Operation Agreement contains the parties' covenants and conditions in connection with the transactions necessary to effect the Proposed Inversion (*i.e.*, the Arrangement and Merger), as well as

---

[37] JX 12 at 65.

[38] JX 6, Ex. 2.1, at 1; *see also* JX 7, Annex A & Annex B (providing that the indicative value per share of Shire is £53.20, the total number of shares issued is 598,420,949, and the exchange rate is $1 to £0.5840). The parties use the $54 billion figure for the value of Shire, but by my own calculation using the provided metrics (*i.e.*, indicative value per share, the total number of shares, and the exchange rate) the indicative value of Shire is closer to $54.5 billion.

[39] JX 7 at 1. The same day, AbbVie and certain of its subsidiaries additionally executed an agreement governing the Merger (the "Merger Agreement"). *See* JX 12 at 78–80. However, the provisions of the Merger Agreement are not at issue in this litigation.

establishes a two-tiered scheme of reverse termination fees payable to Shire by AbbVie if the deal were to fall apart under certain enumerated circumstances.

First, Section 7.1 provides that "on the occurrence of a Break Fee Payment Event . . . AbbVie will pay to Shire an amount in cash in US Dollars equal to three per cent . . . of the indicative value of the cash and shares" that AbbVie was to deliver to Shire's stockholders in the Arrangement, calculated to be approximately $1.635 billion (the "Break Fee").[40] Section 7.2 enumerates the circumstances constituting a "Break Fee Payment Event;" relevant here, Section 7.2.1 states such an Event will occur if (1) the AbbVie board withdraws or modifies in a manner adverse to the Proposed Inversion its recommendation of the Merger; and (2) either (a) the AbbVie stockholders vote and do not adopt the Merger Agreement at a stockholder meeting following the board's change in recommendation, or (b) no stockholder meeting takes place within 60 days after the board's change in recommendation.[41]

Second, Section 10.3 of the Co-Operation Agreement further provides that if AbbVie stockholders vote to not adopt the Merger Agreement in circumstances that do not trigger the Break Fee—for example, where AbbVie's board has not withdrawn or modified its recommendation of the Merger—AbbVie must still pay

---

[40] JX 7, § 7.1; *see also id.* Annex A & Annex B (providing that the indicative value per share of Shire is £53.20, the total number of shares issued is 598,420,949, and the exchange rate is $1 to £0.5840).
[41] *Id.* § 7.2.1.

11

Shire to reimburse and compensate it for costs incurred in connection with the Proposed Inversion (the "Cost Reimbursement Payment").[42] The Cost Reimbursement Payment is calculated based on actual costs incurred by Shire, but in any event can be no less than $500 million or no more than "one per cent . . . of the indicative value of the cash and shares" that AbbVie was to deliver to Shire's stockholders in the Arrangement—approximately $545 million.[43]

The Co-Operation Agreement does not include a clause permitting AbbVie to abandon the Proposed Inversion without paying the Break Fee or Cost Reimbursement Payment if the U.S. government acted to deter inversions.[44]

*E. The Posting of the Banns: AbbVie Touts the Benefits and Explains the Risks of the AbbVie-Shire Union*

In addition to detailing the deal's terms, the Announcement provided the Company's rationale for pursuing the Proposed Inversion. In the section entitled, "Background to and reasons for the Transaction," the Company listed several strategic and financial benefits that it expected to capture, including that "AbbVie expects the [Proposed Inversion] to reduce the effective tax rate for New AbbVie to approximately 13 per cent. by 2016," and that "[t]he new tax structure will

---

[42] *Id.* § 10.3.

[43] *Id.*; *see also id.* Annex A & Annex B (providing that the indicative value per share of Shire is £53.20, the total number of shares issued is 598,420,949, and the exchange rate is $1 to £0.5840).

[44] *See id.* §§ 7, 10.

provide AbbVie with flexible access to its global cash flows."[45]  The Company

repeated and elaborated on its rationales in the preliminary proxy statement,

including "the potential realization of tax and operational synergies by New

AbbVie" and "the opportunity for New AbbVie to have an enhanced financial

profile and greater strategic and financial flexibility."[46]

Also in the preliminary proxy statement, the Company explained that it

weighed the Proposed Inversion's potential benefits "against a number of

uncertainties, risks and potentially negative factors," including the possibility of

having "to pay the Break Fee and [Cost Reimbursement Payment] under certain

circumstances specified in the Co-Operation Agreement" and

> the risk that a change in applicable law with respect to Section 7874
> of the [Internal Revenue] Code or any other US tax law, or official
> interpretations thereof, could cause New AbbVie to be treated as a US
> domestic corporation for US federal income tax purposes following
> the consummation of the [Proposed Inversion].[47]

AbbVie provided more robust discussion of the latter tax-based risk in the "Risk

Factors" section of the preliminary proxy statement, including specific multi-

paragraph subsections explaining how "[t]he US Internal Revenue Service

. . . may not agree with the conclusion that New AbbVie is to be treated as a

---

[45] JX 6, Ex. 2.1, at 9–11.

[46] JX 12 at 53; *see also id.* at 4 (explaining the expected tax benefits of operating under the U.K.
tax code as opposed to the U.S. tax code, but cautioning that "New AbbVie's ability to realize
these benefits is subject to certain risks. See '*Risk Factors*' beginning on page 25.").

[47] *Id.* at 54.

foreign corporation for US federal income tax purposes following the [Proposed Inversion]," and "[f]uture changes to US or international tax laws could adversely affect New AbbVie."[48]  In the latter subsection, the Company discussed specific then-pending legislative proposals that, if enacted, could have the effect of eliminating the tax benefits of the Proposed Inversion.[49]  In addition, the Company reiterated the risk of an adverse change in U.S. tax law in the section of the preliminary proxy statement addressing U.S. federal income tax consequences, explaining, in a multi-page discussion, that

> a subsequent change in the facts or in law might cause New AbbVie to be treated as a domestic corporation for US federal income tax purposes, including with retroactive effect.  In addition, by the time of the completion of the [Proposed Inversion], there could be a change in law under Section 7874 of the [Internal Revenue] Code, in the regulations promulgated thereunder, or other changes in law that, if enacted, could (possibly retroactively) cause New AbbVie to be treated as a US corporation for US federal income tax purposes.[50]

In laying out the totality of expected benefits and risks of the Proposed Inversion in the preliminary proxy statement, AbbVie clarified that it could not, and did not attempt to, weigh the importance of any one benefit or risk:

> In view of the wide variety of factors considered by the AbbVie Board in connection with its evaluation of the [Proposed Inversion], the

---

[48] *Id.* at 30–31.

[49] *See id.* at 31 (describing a provision in the Obama administration's 2015 budget proposals and certain legislative proposals, and explaining that "[t]hese proposals, if enacted in their present form and if made retroactively effective to transactions completed during the period in which the effective time of the transaction occurs, would cause New AbbVie to be treated as a US corporation for US federal tax purposes").

[50] *Id.* at 94.

14

> AbbVie Board did not consider it practical to, and did not, quantify, rank or otherwise assign specific weights to the factors that it considered in reaching its determination and recommendation. . . . The AbbVie Board considered this information as a whole, and overall considered the information and factors to be favorable to, and in support of, its determinations and recommendations.[51]

However, when pressed by investors and analysts in a follow-up conference call to reveal just how important the tax benefits were to AbbVie in pursuing the Proposed Inversion, Gonzalez downplayed the tax implications, stating that "[t]ax is clearly a benefit, but it's not the primary rationale for [the Proposed Inversion];" that the deal "has excellent strategic fit and has compelling financial impact well beyond the tax impact;" and that AbbVie "would not be doing it if it was just for the tax impact."[52]

### F. Shifting Regulatory Backdrop: "If Anyone Knows Just Cause Why These Two Should Not Be Wed, Let Him Speak Now . . ."

#### 1. Closing the Inversion "Loophole"

Neither tax inversions nor political opposition to tax inversions is a novel development. A decade prior to the announcement of the Proposed Inversion, the U.S. government, in an effort to protect its tax base against tax inversions, included an anti-inversion provision in the American Jobs Creation Act of 2004 (the "AJCA") targeting and eliminating a straightforward inversion technique that had

---

[51] *Id.* at 55.
[52] JX 24.

15

become popular in the preceding years known as a "naked inversion."[53] However, the AJCA left open other avenues to an inversion, notably mergers with foreign corporations: After the AJCA, a U.S. corporation could still re-organize in a foreign country and be treated as a non-U.S. corporation for federal income tax purposes if the U.S. corporation's former stockholders owned less than 80% of the resulting foreign entity.[54]

In the years leading up to the Proposed Inversion, several high-profile companies—most notably Pfizer[55]—had announced plans to pursue an inversion through a merger with a foreign company, reigniting "concerns about an erosion of the U.S. tax base" and cultivating a hostile political environment for these types of transactions.[56] In fact, as AbbVie planned and pursued the Proposed Inversion into 2014, the U.S. government was simultaneously openly exploring possible ways to deter inversions, through both legislative and administrative action.[57] As pointed

---

[53] JX 13 at 3–5. In a naked inversion, a U.S. parent corporation could re-domicile in a foreign country simply by exchanging stock with a foreign subsidiary, creating a foreign parent corporation and a U.S. subsidiary. *Id.* at 2–3. The anti-inversion provision in the AJCA "eliminated" naked inversions by eliminating the underlying tax benefit, amending Section 7874 of the Internal Revenue Code to "treat[] the inverted foreign parent company as a domestic corporation if it is owned by at least 80% of the former parent's stockholders," with a safe harbor exception for U.S. corporations that already had substantial business activities in the foreign country. *Id.* at 5. Of course, a U.S. corporation could still re-domicile through a naked inversion, but it would not receive the tax benefit.

[54] *Id.* at 5.

[55] *See* JX 18.

[56] JX 13 at 2, 5–7.

[57] *See, e.g.*, *id.* at 7–11 (providing an overview of the policy options available to address the problem of merger-based inversions, including both reforming the U.S. corporate income tax and eliminating the tax benefits of merger-based inversions).

out by AbbVie in its preliminary proxy statement, numerous concrete proposals to eliminate these transactions' tax benefits had surfaced by July 2014, including proposed legislation in both houses of Congress—The Corporate Inversion Prevention Act of 2014—which would be effective to any transaction completed after May 8, 2014, and a provision in the Obama administration's 2015 budget proposals that would be effective to any transaction completed after December 31, 2014.[58]

### 2. Skepticism that Government Would Act in the Short Term

Despite the heated anti-inversion rhetoric and development of specific anti-inversion proposals throughout the first half of 2014, whether, when, and to what effect the government would implement any particular anti-inversion proposal was uncertain. Some prominent commentators and analysts found it unlikely that any legislative action to curb inversions would occur before 2015 and were doubtful that such action, if taken, would have retroactive effect. On April 29, 2014, the day before AbbVie's board approved approaching Shire regarding the Proposed Inversion, *The New York Times* reported that "Congress is . . . unlikely to act [to

---

[58] JX 12 at 31. AbbVie explains in the preliminary proxy statement that these proposals would jeopardize the tax benefits of inversions, including the Proposed Inversion, by,

> among other things, treat[ing] a foreign acquiring corporation as a US corporation under Section 7874 of the [Internal Revenue] Code if the former shareholders of the US corporation own more than 50% of the shares of the foreign acquiring corporation after the transaction, or if the foreign corporation's affiliated group has substantial business activities in the United States and the foreign corporation is primarily managed and controlled in the United States.

*Id.*; *see also* JX 13 at 10–11.

17

eliminate inversions] during this election year."[59]  Likewise, on July 16, 2014, the

day before AbbVie's board voted to approve the terms of the Proposed Inversion,

the *Times* reported:

> Lawmakers say they want to stop United States companies from reincorporating overseas to lower their tax bills, but the Obama administration and Congress appear unlikely to take any action to stem the tide of such deals anytime soon.
> On Tuesday, Treasury Secretary Jacob J. Lew sent letters to the top members of the House Ways and Means Committee and Senate Finance Committee, urging Congress to take immediate action to halt the rush of companies abroad.  Yet the wave of so-called inversions looks set to continue unabated as a partisan Congress remains gridlocked, and Wall Street advisors continue encouraging companies to strike such deals while they still can.[60]

The *Times*'s view on Wall Street's then-encouraging short-term outlook on

inversions is supported by a July 25, 2014 analyst report on AbbVie by BMO

Capital Markets, which opined:

> Despite the heated rhetoric coming out of Washington, we continue to believe that legislation targeting tax inversions remains unlikely in the near term, given the current political landscape.  Tax inversion is more likely to be addressed as part of comprehensive tax reform rather than a piecemeal provision, and the earliest that could likely happen is 2015.  AbbVie expects to close the deal in 4Q14, and the consensus seems to be that such legislation would not be retroactive.[61]

These same commentators expressed skepticism that the Obama

administration would step in to address inversions in the interim while legislative

---

[59] JX 34.
[60] JX 21.
[61] JX 35.

progress lagged,[62] a skepticism that was shared by key officials within the administration. An April 30, 2014 *Bloomberg BNA Daily Tax Report* article, released the same day the AbbVie board approved approaching Shire about the Proposed Inversion, quotes the Commissioner of the IRS, John Koskinen, as saying, "We've done, I think, probably all we can [to stop inversions] within the statute"; the article interprets these remarks to "show the limits of the government's ability to respond without Congress and suggest that the Obama administration won't make a regulatory move to stop or limit so-called corporate inversions."[63] Similarly, in an interview given on July 16, 2014—the day before the AbbVie board voted to approve the terms of the Proposed Inversion—Secretary of the Treasury Jack Lew, commenting on his letter to Congress alluded to in the July 16 *Times* article, stated:

> We have looked at the tax code. There are a lot of obscure provisions that we do not believe we have the authority to address this inversion question through administrative action. If we did, we would be doing more.
> That's why legislation is needed. That's why we proposed it in our budget. That's why I wrote the letter last night. There are limits to what we can do without legislative action.[64]

---

[62] *See* JX 34 ("Although President Obama has proposed rules that would almost eliminate inversions, his proposal stands little chance of becoming law."); JX 21 ("Lawmakers say they want to stop United States companies from reincorporating overseas to lower their tax bills, but *the Obama administration* and Congress appear unlikely to take any action to stem the tide of such deals anytime soon." (emphasis added)).

[63] JX 36.

[64] JX 37.

### 3. Treasury Implements an Administrative Fix

Whatever confidence existed in the summer of 2014 that the U.S. government could not or would not act in the short term to deter inversions was shattered on August 5, 2014, less than a month after AbbVie's board approved the Proposed Inversion, when the Treasury Department announced it was "reviewing a broad range of authorities for possible administrative actions to limit inversions as well as approaches that could meaningfully reduce the tax benefits after inversions took place."[65] Secretary Lew confirmed the Treasury's anti-inversion initiative a month later in a speech at a Washington think tank, stating that, while he still believed only Congress could permanently solve the inversion problem, given lawmakers' inability to move quickly, "the Treasury Department is completing an evaluation of what we can do to make these deals less economically appealing, and we plan to make a decision in the very near future."[66] On September 21, 2014, Secretary Lew removed all doubt that the Treasury Department would imminently act, revealing in a press conference that "Treasury is completing its work on

---

[65] JX 44 (internal quotation marks omitted); *see also* Rizzolo Pre-Trial Stip. Ex. vv (*Bloomberg* article dated August 7, 2014, by Richard Rubin, entitled, "Treasury's Tax Powers Could Limit Benefits of Inversions") ("The policy landscape on inversions has shifted significantly since last week, when lawmakers—deadlocked on tax policy—left Washington for a five-week break. The lack of congressional action and the Obama administration's reluctance to move on its own had give companies and investors confidence that pending deals wouldn't be affected by government action. . . . With one statement this week, Treasury changed the market assumption that the government wouldn't act without Congress to stem inversion transactions. On Aug. 5, Treasury said that it was examining regulatory changes that would amount to a 'partial fix' while the administration keeps pushing Congress to curb inversions.").
[66] JX 45.

administrative action to use our existing authority to limit the economic benefits of inversion."[67]

G.    *Stranded at the Alter: The Treasury Notice and the Termination Agreement*

On September 22, 2014, the Treasury Department and IRS announced their intent to issue regulatory guidance under various sections of the Internal Revenue Code to eliminate certain tax advantages of merger-based inversions (the "Treasury Notice").[68] The new regulations described in the Treasury Notice would prevent U.S. corporations from utilizing several types of transactions and calculations that were necessary to realize the tax benefits of a merger-based inversion.[69] The Treasury Notice provided that these regulations, when passed, would apply retroactively to any transaction completed on or after the date of the Treasury Notice,[70] and further indicated that "[t]he Treasury Department and the IRS expect to issue additional guidance to further limit inversion transactions that

---

[67] JX 46.
[68] JX 8.
[69] *See* JX 2 ("Treasury is taking action to reduce the tax benefits of—and when possible, stop—corporate tax inversions. This action will significantly diminish the ability of inverted companies to escape U.S. taxation. For some companies considering mergers, today's action will mean that inversions no longer make economic sense. Specifically, the [Treasury] Notice eliminates certain techniques inverted companies currently use to access the overseas earnings of foreign subsidiaries of the U.S. company that inverts without paying U.S. tax.").
[70] *See* JX 8, § 4.

are contrary to the purpose of section 7874 and the benefits of post-inversion tax avoidance transactions."[71]

In the weeks following the Treasury Notice, AbbVie engaged in a "detailed consideration of the U.S. Department of Treasury's unilateral changes to the tax rules."[72] Ultimately, after this review, the board determined:

> The breadth and scope of the changes, including the unexpected nature of the exercise of administrative authority to impact longstanding tax principles, and to target specifically a subset of companies that would be treated differently than either other inverted companies or foreign domiciled entities, introduced an unacceptable level of uncertainty to the [Proposed Inversion].[73]

Further, AbbVie's board indicated that the Treasury's forthcoming anti-inversion regulations had found their mark with regard to the tax benefits of the Proposed Inversion:

> [T]he changes eliminated certain of the financial benefits of the [Proposed Inversion], most notably the ability to access current and future global cash flows in a tax efficient manner as originally contemplated in the [Proposed Inversion]. This fundamentally changed the implied value of Shire to AbbVie in a significant manner.[74]

---

[71] *Id.* § 5.

[72] JX 26, Ex. 99.1, at 1.

[73] *Id.*

[74] *Id.* Specifically, the regulations prevent AbbVie from accessing foreign earnings without incurring a dividend tax through the use of loans from AbbVie's foreign subsidiaries to New AbbVie, known as "hopscotch loans." JX 2. The Treasury regulations eliminated the tax benefit of these hopscotch loans by treating the loans as U.S. property taxable as a dividend, *id.*, not only decreasing the overall tax benefit of the Proposed Inversion but also directly affecting AbbVie's plan to finance the Arrangement. *See, e.g.,* JX 29.

Consequently, on October 15, 2014, the AbbVie board withdrew its favorable recommendation of July 18, 2014 and replaced it with a recommendation that the AbbVie stockholders vote against the Proposed Inversion.[75]

The AbbVie board's change of recommendation triggered the first prong of the Break Fee. A few days later, on October 20, 2014, the Company triggered the second prong when, acknowledging "that there is little prospect of the Proposed [Inversion] being consummated" following the board's change in recommendation, it entered into an agreement with Shire to terminate the Co-Operation Agreement (the "Termination Agreement").[76] In the Termination Agreement, AbbVie agreed to pay Shire the Break Fee of approximately $1.635 billion.[77]

*H. The Section 220 Demands*

1. The SEPTA Demand

Plaintiff SEPTA made a written demand on AbbVie for inspection of certain books and records pursuant to Section 220 on November 3, 2014 (the "SEPTA Demand").[78] In it, SEPTA demands inspection of ten categories, including thirty sub-categories, of documents,[79] the stated purposes for which are:

---

[75] JX 26, Ex. 99.1, at 1. I note that the AbbVie board's recommendation of July 18, 2014 was limited to the stockholders' adoption of the Merger Agreement, but that the board's change in recommendation of October 15, 2014 addressed the Proposed Inversion as a whole.

[76] JX 9, Ex. 10.1, at Recital C.

[77] *Id.,* Ex. 10.1, § 2.

[78] SEPTA Compl. ¶ 3.

[79] *See* JX 1, Ex. C.

(1) to investigate possible breaches of fiduciary duties and mismanagement by the Board and officers of AbbVie in connection with approving the Break Fee;

(2) to investigate possible breaches of fiduciary duties and mismanagement by the Board and officers of AbbVie in connection with the Board's Change in Recommendation announced on October 15, 2014;

(3) to investigate possible breaches of fiduciary duties and mismanagement by the Board and officers of AbbVie in connection with AbbVie's entry into the Termination Agreement;

(4) to investigate possible waste of corporate assets and breaches of fiduciary duties by the Board and officers of AbbVie in connection with AbbVie's payment of the $1.64 billion Break Fee; and

(5) to investigate the ability of the Board to consider a demand to initiate and maintain litigation related to any breaches of fiduciary duty prior to commencing any derivative litigation.[80]

## 2. The Rizzolo Demand

Plaintiff Rizzolo made a written demand on AbbVie for inspection of certain books and records pursuant to Section 220 on November 17, 2014 (the "Rizzolo Demand").[81] In it, Rizzolo demands inspection of five categories, including twelve sub-categories, of documents,[82] for purposes of:

(i) investigating possible wrongdoing, self-dealing and breaches of fiduciary duties by the directors and officers of the Company in connection with the termination of the [Proposed Inversion] and the Company's obligation to pay the [Break Fee] to Shire and (ii) investigating possible aiding and abetting by [J.P. Morgan]

---

[80] *Id.* at 6–7.
[81] Rizzolo Compl. ¶ 9.
[82] *See* JX 11, Ex. A, at 10–12.

24

concerning the breaches of fiduciary duty of AbbVie's Board and senior management.[83]

*I. Procedural History*

AbbVie countered each of the SEPTA and Rizzolo demands with a letter rejecting the demand for failure to state a proper purpose.[84] In response, SEPTA filed its Section 220 Complaint on November 19, 2014, and Rizzolo filed its Section 220 Complaint on December 1, 2014. Since the two actions stem from the same event, the parties in both actions agreed to coordinate their briefing and argument. However, because the stated purposes and documents sought are not identical between the two actions, the cases were not consolidated.[85]

A coordinated, one-day trial on the papers in both actions was held on February 11, 2015. On April 7, 2015, for the sake of efficiency and clarity, the parties in both actions stipulated to a comprehensive, joint record to be entered in both actions, as well as consented to the Court utilizing this single Memorandum Opinion to deliver its decisions.

---

[83] *Id.* at 12.
[84] *See* JX 10; JX 40.
[85] I note that Rizzolo filed a Motion to Consolidate, but that SEPTA resisted that Motion.

## II. ANALYSIS

### A. Inspection Right

"Stockholders of Delaware corporations enjoy a qualified right to inspect the corporation's books and records."[86] Originally a creature of common law, the inspection right is now codified in Section 220 of the Delaware General Corporation Law.[87] The right to inspection is qualified out of considerations that are practical, rather than equitable; if a stockholder were permitted to inspect records out of a sense of mere curiosity, or to satisfy a desire to oversee matters properly within the province of corporate management or the corporate board, a considerable expense and distraction would be foisted upon the company and its (less curious) stockholders, with likely little value in return. A stockholder is entitled to inspect books and records under Section 220, therefore, only for a proper purpose, defined in the statute as "a purpose reasonably related to such person's interest as a stockholder."[88] In an action to enforce the Section 220 inspection right, the plaintiff stockholder has the burden to demonstrate a proper purpose by a preponderance of the evidence.[89]

---

[86] *Central Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 143 (Del. 2012).
[87] *Id.*
[88] 8 *Del. C.* § 220(b).
[89] *Id.* § 220(c); *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

Even if a stockholder establishes a proper purpose under Section 220, "the scope of the stockholder's inspection is limited to those books and records that are necessary and essential to accomplish the stated, proper purpose."[90]

*B. Proper Purpose*

Both SEPTA and Rizzolo seek books and records for the purpose of investigating potential breaches of fiduciary duties, mismanagement, wrongdoing, and waste[91] by AbbVie's directors and officers in connection with AbbVie's obligation to pay the $1.635 billion Break Fee contained in the Co-operation Agreement. In addition, SEPTA separately seeks books and records for the purpose of investigating demand futility,[92] and Rizzolo separately seeks books and records to investigate aiding and abetting by J.P. Morgan.

---

[90] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002).

[91] For simplicity sake, I will use the shorthand "corporate wrongdoing."

[92] As SEPTA acknowledged at trial, *see* Trial Tr. 19:7–14, investigating demand futility is a proper purpose only if the plaintiff has established a credible basis to investigate corporate wrongdoing that ultimately could form the basis of a derivative suit. *La. Mun. Police Emps.' Ret. Sys. v. Hershey Co.*, 2013 WL 6120439, at *7 n.58 (Del. Ch. Nov. 8, 2013); *see also Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, at *10 (Del. Ch. Feb. 12, 2009) (finding that investigating demand futility does not state a purpose "beyond investigating the possibility of bringing a derivative action"). Because I find below that SEPTA has failed to show a credible basis supporting an investigation into corporate wrongdoing among AbbVie's directors and officers, its stated purpose to investigate demand futility is moot.

## 1. Investigating Potential Corporate Wrongdoing by AbbVie's Directors and Officers

### a. Reason for Investigation

It is well established that investigation of potential corporate wrongdoing is a proper purpose for a Section 220 books and records inspection.[93] However, it is also well established that "a stockholder 'must do more than state, in a conclusory manner, a generally acceptable proper purpose'—the investigation of corporate mismanagement 'must be to some end.'"[94] "In other words, [the] plaintiff 'must state a reason for the purpose, *i.e.*, what it will do with the information or an end to which that investigation will lead.'"[95] There are a number of acceptable reasons why stockholders may seek to investigate corporate wrongdoing—"they may seek to institute possible derivative litigation, or 'they may seek an audience with the board to discuss reforms or, failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect new directors.'"[96] Here, however, neither SEPTA nor Rizzolo expressly state in its demand letter why it is investigating corporate wrongdoing at AbbVie.

---

[93] *Thomas & Betts Corp. v. Leviton Mfg. Co.,* 681 A.2d 1026, 1031 (Del. 1996); *see also Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007) ("There is no shortage of proper purposes under Delaware law, but perhaps the most common 'proper purpose' is the desire to investigate potential corporate mismanagement, wrongdoing, or waste." (internal citations omitted)).

[94] *Graulich v. Dell Inc.*, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011) (quoting *West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 646 (Del. Ch. 2006)).

[95] *Id.* (quoting *West Coast Mgmt. & Capital LLC*, 914 A.2d at 646).

[96] *Id.* (quoting *Saito*, 806 A.2d at 117).

This Court has cautioned stockholders in the past of the importance of specificity in stating the purpose for their demands:

> [T]o warrant relief, a demand for books and records must be sufficiently specific to permit the court (and the corporation) to evaluate its propriety. . . . "[U]nless a demand in itself unspecific as to purpose can in some way successfully be given an expanded reading viewed in the light of surrounding circumstances[,] a vague demand without more must *a fortiori* be deemed insufficient."[97]

More pointedly, the Court has explicitly warned that a plaintiff who states a purpose to investigate corporate wrongdoing, without elaboration as to *why* that investigation is relevant to its interest as a stockholder, has not stated a proper purpose at all:

> [T]he nature of section 220 as an independent right does not eliminate the proper purpose requirement. The plaintiff states its purpose is ". . . to investigate potential breaches of fiduciary duty by the Company's officers and directors." *This demand states no purpose.* Although investigating wrongdoing is a proper purpose, it must be to some end. Delaware law does not permit section 220 actions based on an ephemeral purpose, nor will this court impute a purpose absent the plaintiff stating one.[98]

Although the failure of both SEPTA and Rizzolo to specify the "end" to which their investigations will lead could be read as a failure to state a purpose at all, I find it apparent enough from the Plaintiffs' statements at oral argument to infer that

---

[97] *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *11 (Del. Ch. Feb. 12, 2009) (quoting *Weisman v. W. Pac. Indus., Inc.*, 344 A.2d 267, 269 (Del Ch. 1975)) (citing *Northwest Indus., Inc. v. B.F. Goodrich Co.*, 260 A.2d 428, 429 (Del. 1969)).

[98] *West Coast Mgmt. & Capital LLC*, 914 A.2d at 646 (emphasis added).

29

both Plaintiffs seek an investigation to aid in future derivative litigation.[99]

However, as neither Plaintiff has mentioned—in briefing or at argument—an intention to take any other proper action with the books and records sought, I find that litigation is the sole motivation for the Plaintiffs' investigations into corporate wrongdoing among AbbVie's directors and officers.[100]

### b. Effect of Exculpatory Provision

SEPTA and Rizzolo's claim of a proper purpose to investigate corporate wrongdoing by AbbVie's directors and officers must be evaluated in light of the fact that AbbVie's Certificate of Incorporation exculpates AbbVie directors from liability for breach of the duty of care pursuant to Section 102(b)(7) of the DGCL.[101] According to the Company: "Because plaintiffs have no potential remedy against the directors in a derivative claim for breach of the duty of care,

---

[99] *See, e.g.*, Trial Tr. 7:19–24. In addition, I note that, aside from an investigation into corporate wrongdoing, SEPTA also states a purpose to investigate the AbbVie board's ability to "consider a demand to initiate and maintain litigation related to any breaches of fiduciary duty prior to commencing any derivative litigation," indicating that it will use the results of its investigation to pursue litigation against AbbVie's directors. JX 1 at 7.

[100] *See Graulich v. Dell Inc.*, 2011 WL 1843813, at *7 (Del. Ch. May 16, 2011) ("[T]he Amended Demand letter states that plaintiff's purpose is to commence an 'appropriate suit' if it is found that the directors breached their fiduciary duties; it does not say that plaintiff's purpose includes taking any other 'appropriate action.' Thus, plaintiff has no additional stated purposes and none can be reasonably inferred—the only purpose that can be fairly read out of plaintiff's demand is that he seeks to investigate 'whether there was a systematic failure by the Board to supervise' *in order to determine whether there is a basis to file a derivative suit*." (citation omitted)); *cf. Norfolk Cnty. Ret. Sys.*, 2009 WL 353746, at *11 (noting that "Norfolk has not stated anywhere that it intends to engage in a proxy contest, or communicate directly with the board, or take some specific action other than evaluating the actions of the board for a potential derivative suit," but allowing an inference that such an alternate purpose exists on a motion for summary judgment because plaintiff stated in its demand that it would take "appropriate action" if the defendants did not properly discharge their fiduciary duties).

[101] JX 41, art. IX.

investigating any such breach is futile and not a proper purpose for a Section 220 demand."[102]  SEPTA and Rizzolo disagree, arguing that consideration of an exculpatory provision is improper in the context of a Section 220 action, because Section 220 is meant only to be a preliminary fact-finding tool to unearth corporate wrongdoing and an exculpatory provision does not actually eliminate the duty of care of a breach thereof, only a director's ultimate liability in a plenary action.[103]

This Court has not squarely addressed the issue of whether, when a stockholder seeks to investigate corporate wrongdoing *solely* for the purpose of evaluating whether to bring a derivative action, the "proper purpose" requirement under Section 220 is limited to investigating non-exculpated corporate wrongdoing.  However, analogous decisions interpreting Section 220 support the conclusion that such a limitation should exist.  Specifically, this Court has found that, although "investigating the possibility of pursuing a derivative action based on perceived wrongdoing by a corporation's officers or directors represents a proper purpose for a Section 220 demand," "[i]f the filing of such a future derivative action would be barred by claim or issue preclusion, . . . a [Section] 220 demand may be denied as a matter of law."[104]  Likewise, the Court has denied a

---

[102] AbbVie's Consolidated Response to Pls.' Opening Trial Brs. at 22.

[103] *See* SEPTA's Reply Trial Br. at 18–20; Rizzolo's Reply Trial Br. at 7–9.

[104] *Norfolk Cnty. Ret. Sys.*, 2009 WL 353746, at *6 (citing *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006), *Saito v. McKesson, HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002), and *Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, at 567–68 (Del. 1997));

31

stockholder the ability to inspect books and records solely to investigate bringing litigation where the stockholder would lack standing in the underlying suit[105] or the underlying suit would be time-barred.[106] These holdings, and the necessity of proper balance of the benefits and burdens of production under Section 220, illustrate that the proper purpose requirement under that statute requires that, if a stockholder seeks inspection solely to evaluate whether to bring derivative litigation, the corporate wrongdoing which he seeks to investigate must necessarily be justiciable.[107] Because a Section 102(b)(7) exculpatory provision serves as a

---

*see also Fuchs Family Trust v. Parker Drilling Co.*, 2015 WL 1036106, at *5–7 (Del. Ch. Mar. 4, 2015).

[105] *See Graulich v. Dell Inc.*, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011) ("If plaintiff would not have standing to bring suit, plaintiff does not have a proper purpose to investigate wrongdoing because it stated purpose is not reasonably related to its role as a stockholder."); *West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006) ("If a books and records demand is to investigate wrongdoing and the plaintiff's sole purpose is to pursue a derivative suit, the plaintiff must have standing to pursue the underlying suit to have a proper purpose."); *Polygon Global Opportunities Master Fund v. West Corp.*, 2006 WL 2947486, at *5 (Del. Ch. Oct. 12, 2006) (holding that the plaintiff's purpose to investigate claims of corporate wrongdoing solely to determine whether the board members had breached their fiduciary duties was not proper because "[t]his purpose is not reasonably related to [the plaintiff's] interest as a stockholder as it would not have standing to pursue a derivative action based on any potential breaches").

[106] *See Graulich*, 2011 WL 1843813, at *6 ("As this Court has held, in a factual setting, a time bar defense or a claim or issue preclusion defense would eviscerate any showing that might otherwise be made in an effort to establish a proper shareholder purpose." (internal quotation marks omitted)).

[107] *See La. Mun. Police Emps.' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *2 (Del. Ch. Oct. 5, 2012) ("[S]tockholders are only permitted to investigate those issues that affect their interests as stockholders. In other words, if a stockholder seeks to use Section 220 to investigate corporate wrongdoing for which there is no remedy, or if the stockholder would not have standing to seek a remedy, then that stockholder has not stated a proper purpose." (citation omitted)). *But see Amalgamated Bank v. UICI*, 2005 WL 1377432, at *2 (Del. Ch. June 2, 2005) (stating that affirmative defenses "solely" may not "bar a plaintiff under Section 220").

Rizzolo relies on this Court's recent decision in *In re Rural Metro Corp. Stockholders Litigation* to argue that an exculpatory provision should not affect the proper purpose analysis,

bar to stockholders recovering for certain director liability in litigation, a stockholder seeking to use Section 220 to investigate corporate wrongdoing solely to evaluate whether to bring derivative litigation has stated a proper purpose only insofar as the investigation targets non-exculpated corporate wrongdoing. Here, that means that SEPTA and Rizzolo's stated purpose to investigate corporate wrongdoing is proper only to investigate whether AbbVie's directors breached their fiduciary duty of loyalty.[108] I stress that this burden, as explained below,

because such a provision "does not eliminate the underlying duty of care or the potential for fiduciaries to breach that duty." 88 A.3d 54, 85 (Del. Ch. 2014). Rizzolo's argument is misplaced: He seeks records solely in aid of derivative litigation; when the sole purpose is litigation-driven, the appropriate focus is whether the underlying litigation is justiciable; otherwise, the stockholder's purpose is eviscerated, and the stockholder has failed to meet its statutory burden to show a purpose reasonably related to its interest as a stockholder. However, nothing in this Memorandum Opinion should be read to hold that directors' breaches of exculpated duties can never be a basis to support a Section 220 request on grounds other than pursuit of derivative litigation.

[108] I note that both SEPTA and Rizzolo state that they wish to investigate corporate wrongdoing among AbbVie's directors *and officers*. Since an exculpatory provision pursuant to Section 102(b)(7) only applies to directors, the limitation on Section 220 demands imposed by an exculpatory provision described in this section would not apply to officers. *Cf. Gantler v. Stephens*, 965 A.2d 695, 708–09 & n.37 (Del. 2009) (holding that "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors," but noting: "That does not mean, however, that the consequences of a fiduciary breach by directors or officers, respectively, would necessarily be the same. Under 8 *Del. C.* § 102(b)(7), a corporation may adopt a provision in its certificate of incorporation exculpating its directors from monetary liability for an adjudicated breach of their duty of care. Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers."). In other words, a stockholder *could* state a proper purpose to investigate breaches of the fiduciary duty of care by a corporation's officers solely for the purpose of pursuing derivative litigation, despite the existence of an exculpatory provision in the corporation's articles of incorporation. Here, however, officers are included in the Plaintiffs' stated proper purposes in name only; SEPTA and Rizzolo have failed to meet their burden to show a credible basis from which the Court can infer any corporate wrongdoing on the part of AbbVie's non-exculpated officers. Both Plaintiffs' briefs are almost entirely directed towards the actions taken by AbbVie's board in connection with the Proposed Inversion and Break Fee. The only officer specifically mentioned by either Plaintiff is AbbVie's

remains among the lightest burdens recognized in our jurisprudence; the plaintiff need only develop a "credible basis" from which I may infer actionable corporate wrongdoing, and "documents, logic, testimony," or other evidence[109] from which I may infer *both* potentially exculpated and actionable wrongdoing, obviously, are sufficient for that purpose under Section 220. While, with regard to Plaintiffs' demands here, the focus must be on actionable corporate wrongdoing, the hurdle is still a low one to clear.

### c. Credible Basis

SEPTA and Rizzolo have stated a proper purpose in investigating non-exculpated corporate wrongdoing in aid of potential litigation, but merely stating this purpose is not sufficient; a stockholder seeking inspection to investigate corporate wrongdoing must demonstrate "a 'credible basis' from which a court can infer that mismanagement, waste or wrongdoing may have occurred."[110] The "credible basis" standard "reflects judicial efforts to maintain a proper balance between the rights of stockholders to obtain information based upon credible allegations of corporate wrongdoing and the rights of directors to manage the

---

CEO Richard Gonzalez, who also serves as the Chairman of AbbVie's board, under the protection of AbbVie's exculpatory provision for acts in his capacity as a director. The Plaintiffs' focus is on the actions of the board in entering the Proposed Inversion, then withdrawing, not on the actions of the officers in developing the deal or negotiating its terms. Therefore, I proceed by considering only whether there is a credible basis to infer that AbbVie's directors have breached their fiduciary duty of loyalty.
[109] *Security First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997).
[110] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006).

business of the corporation without undue interference from stockholders."[111]  As addressed above, the Plaintiffs here must show a credible basis from which I can infer that the Company's directors engaged in justiciable corporate wrongdoing, specifically—in light of the applicable exculpation provision—whether they breached their fiduciary duty of loyalty.  Neither Plaintiff bases its investigation into corporate wrongdoing at AbbVie on allegations that AbbVie's directors were interested or lacked independence from interested parties in the Proposed Inversion; rather, the Plaintiffs[112] allege that the directors breached their duty of loyalty by acting in bad faith—that is, "acted with scienter . . . 'an 'intentional dereliction of duty' or a 'conscious disregard' for their responsibilities"[113]—or by committing corporate waste.[114]  In addition, Rizzolo argues, based on this Court's

---

[111] *Id.* at 122.

[112] Although Rizzolo forewent making any argument in its briefing that there exists a credible basis to infer that AbbVie's directors engaged in non-exculpated corporate wrongdoing, instead arguing that the Court should consider corporate wrongdoing amounting to a breach of the duty of care, *see* Rizzolo's Reply Trial Br. at 7–10, 12–21, I assume for the purposes of this Memorandum Opinion that Rizzolo adopted SEPTA's arguments in this regard at the coordinated oral argument.

[113] *In re Goldman Sachs Grp., In. S'holder Litig.*, 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011) (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)).

[114] This Court has found that, doctrinally, waste is a subset of good faith under the umbrella of the duty of loyalty (and thus is not protected by a Section 102(b)(7) exculpation provision). *See, e.g.*, *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) ("The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith." (citing *White v. Panic*, 783 A.2d 543, 553–55 (Del. 2001))).  While that seems to me the appropriate theoretical framework, I note the existence of an academic debate as to whether that issue is truly settled. *See, e.g.*, Jamie L. Kastler, Note, *The Problem with Waste: Delaware's Lenient Treatment of Waste Claims at the Demand Stage of Derivative Litigation*, 95 Minn. L. Rev. 1899, 1911–14 (2011) (arguing that this Court has not "officially rule[d] on whether waste falls under the duty of care (exculpable) or the duty of loyalty (nonexculpable)," but summarizing recent cases indicating that "waste falls under the duty of loyalty through the duty of good faith");  Joseph K.

ruling in *U.S. Die Casting and Development Company v. Security First Corporation*,[115] that "investigation of potential mismanagement relating to a failed merger is a proper purpose for a Section 220 books and records inspection."[116]

I first consider whether there is a credible basis to infer that the directors acted in bad faith. The Plaintiffs argue that, in approving and eventually triggering a 3% reverse termination fee that did not carve out a contingency for the U.S government taking action to deter merger-based inversions, the directors either failed to consider or ignored what the Plaintiffs describe as the near-certainty that such government action would occur and would have a deal-breaking impact on the Proposed Inversion.[117] To support the credibility of these allegations, the Plaintiffs point out that "[t]he AbbVie Board approved and recommended an inversion transaction with Shire with knowledge that the federal government was focused on retroactively eliminating the tax benefits of inversion deals;" that the Co-Operation Agreement included an "enormous" Break Fee lacking any

---

Leahy, *Are Corporate Super PAC Contributions Waste or Self-Dealing? A Closer Look*, 79 Mo. L. Rev. 283, 308–09 (2014) (noting that the issue may not be settled, but arguing that the doctrinal underpinnings of waste illustrate that "waste apparently constitutes a breach of a director's duty of loyalty"). I assume for the purposes of this Memorandum Opinion that waste constitutes non-exculpated corporate wrongdoing that could form the basis for a proper Section 220 inspection under these circumstances.

[115] 711 A.2d 1220 (Del. Ch. 1996), *aff'd in part, rev'd in part,* 687 A.2d 563 (Del. 1997),

[116] Rizzolo's Opening Trial Br. at 18.

[117] *See, e.g.*, Trial Tr. 13:6–18:16; Rizzolo's Opening Trial Br. at 17 ("Plaintiff's Demand expressly stated a proper purpose. Specifically, Plaintiff requested from AbbVie books and records to further Plaintiff's investigation into possible breaches of fiduciary duty in connection with the Board's reckless decision to enter into the Proposed Inversion resulting in the Company's obligation to pay the $1.635 billion Termination Fee absent of any meaningful attempt by the Board to negotiate a fiduciary-out or lower fee.").

contingency permitting the board to change its recommendation in case the government acted to curb inversions; that the Company's preliminary proxy statement did not identify the tax benefit as the only or key benefit of the Proposed Inversion; and that, following the Treasury Notice, the board nonetheless changed its recommendation, triggering the Break Fee.[118]  According to SEPTA:

> The fact that the AbbVie Board determined that it could no longer recommend the [Proposed Inversion] after the [Treasury Notice] raises a credible basis under the circumstances to infer that the AbbVie Board may have breached its fiduciary duties in originally approving and recommending the [Proposed Inversion] on the terms provided. . . .
> Further, the numerous benefits touted by the AbbVie Board in support of its approval and recommendation of the [Proposed Inversion] casts question on the Board's decision to make the Change in Recommendation and enter into the Termination Agreement when only one of the numerous benefits was eliminated pursuant to the fruition of a known and palpable risk.
> …
> Moreover, the enormous magnitude of the Break Fee supports SEPTA's credible basis under the circumstances.[119]

Contrary to the Plaintiffs' position, I do not find that the record establishes a credible basis to doubt that AbbVie's directors acted in good faith in connection with the approval or subsequent termination of the Proposed Inversion.  I first note that the Break Fee is "enormous," to use SEPTA's phrasing, in the abstract, but not in the context of the equally enormous value of the transaction itself: Agreeing to a

---

[118] SEPTA's Reply Trial Br. at 3–9.
[119] *Id.* at 7–9.

3% termination fee is not intrinsically unusual,[120] let alone a credible indication of bad faith. Rather, if AbbVie's agreement to the Break Fee is evidence of bad faith, it must be because the risk of termination was so clear that agreeing to the Break Fee entailed a willful and wrongful decision to disregard the corporate interest; it cannot rest simply on the amount of the Break Fee.

Turning to that issue, while the record does reflect that there was a hostile political environment for inversions during the time the Company pursued the Proposed Inversion, it also reflects that the board was informed of this risk and had factored it into their decision to approve the deal. Specifically, the preliminary proxy statement explicitly states that the tax savings would be a benefit of the deal, but that the Company had weighed that benefit against the risk that the U.S government could change or reinterpret applicable tax law to eliminate that benefit, even explaining to stockholders in detail the concrete anti-inversion measures Congress and the Obama administration had already proposed.[121] The record lacks any indication that the directors consciously chose to disregard that risk. Simply

---

[120] *See, e.g.*, *In re Pennaco Energy, Inc.*, 787 A.2d 691, 702 (Del. Ch. 2001) (noting that the defendant corporation "resisted [the buyer's] request for a termination fee equal to 5% of the value placed on [the defendant's] equity in the transaction, and had settled on a termination fee at the more traditional level of 3%"); *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1181 n.10 (Del. Ch. 2007) (listing cases involving termination fees at or above 3%).

[121] *See supra* Part I.E. Although it is not necessary to my determination here, I also note that, despite the government's anti-inversion posture, the record illustrates that through the date AbbVie executed the Co-Operation Agreement the opinion of a number of commentators, analysts, and even government officials themselves was that the legislative branch would not, and the administrative branch could not, act to deter inversions in the short term. *See supra* Part I.F.2; note 65.

because the risk accepted by AbbVie's directors to secure a deal with Shire came to fruition does not raise a credible basis to infer that AbbVie's directors intended that adverse event to happen, or knew but were indifferent to that fact, to the Company's detriment, so as to demonstrate a lack of good faith.[122] Moreover, the record suggests that the $1.635 billion Break Fee was an actively negotiated provision by a reluctant merger target.[123] Again, while a large dollar amount, it was a commonplace 3% of total value of that target.

Having not found a credible basis to infer that the directors acted in bad faith, I next turn to considering whether SEPTA has shown a credible basis to infer that AbbVie's board committed corporate waste by paying the Break Fee. Our Supreme Court restated the well-developed judicial standard for corporate waste in *Brehm v. Eisner*:

---

[122] The Plaintiffs conceded at trial that misapprehension of risk alone is not actionable conduct, but attempted to distinguish these facts based on the Company's public disclosures. Trial Tr. 16:7–18:16, 30:15–33:7. Specifically, SEPTA argued that the Company's failure to identify the tax benefit as a "deal breaker" in the preliminary proxy statement indicates that the Company ignored or was not cognizant of the repercussions of the tax benefit on the deal as a whole, *see id.* 17:3–18:16, and Rizzolo argued that, because AbbVie identified several reasons for pursuing the Proposed Inversion outside the tax benefit in the preliminary proxy statement and in public statements, yet abandoned the deal when the Treasury Notice was announced, the board either intentionally misled stockholders or acted against stockholder interest in terminating the deal. *See id.* 31:5–33:7. I do not find either argument persuasive. To the extent I understand SETPA's argument, the most I can reasonably infer from the lack of disclosure regarding the "deal breaker" status of the tax benefit is that the directors negligently failed to take into account the effect of a single risk (the loss of the tax benefit) on the viability of the deal as a whole; if so, to my mind, this fails to prove a credible basis to demonstrate a breach of care, let alone loyalty. As to Rizzolo's argument, it is entirely possible that a corporation could want to pursue a transaction for several reasons, the loss of any of which would make the transaction no longer financially or strategically tenable.

[123] *See supra* notes 31–33 and accompanying text.

> Roughly, . . . waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is *any substantial* consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky.[124]

The *Brehm* Court's guidance is of particular relevance to these facts. The record illustrates that the AbbVie board entered into a deal that, if not for the change in tax law, would have created value for AbbVie's stockholders. The Break Fee was one of the cogs in the Co-Operation Agreement that helped bring Shire into that deal. It is inappropriate for this Court to attempt, in retrospect and under the guise of the waste standard, to judge whether including the Break Fee was appropriate given the risk that government action might sink the deal, or to judge whether paying the Break Fee was better for the Company than forging ahead with the deal without the tax benefit: "Any other rule would deter corporate boards from the optimal rational acceptance of risk . . . . Courts are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk."[125] On the record created here, there is no credible basis from which I may infer waste.

---

[124] *Brehm v. Eisner*, 746 A.2d 244, 265 (Del. 2000).
[125] *Id.*

Finally, I consider Rizzolo's argument that, according to this Court's ruling in *U.S. Die Casting & Development Company v. Security First Corporation*, "a plaintiff's 220 demand to investigate the possibility of corporate mismanagement[] related to the circumstances of a defunct merger is a proper purpose under Delaware law."[126] In *U.S. Die Casting*, the defendant corporation, Security First Corp., entered into a merger agreement with Mid Am Inc. that required Security First Corp. to "pay a termination fee of $2 million, plus third party expenses not to exceed $250,000 contingent on the occurrence of certain events within one year after termination."[127] Prior to the merger closing, Security First Corp. terminated the agreement claiming there was a clash in "management philosophy and direction" and, despite that none of the events enumerated in the termination fee provision had been triggered, agreed to pay Mid Am Inc. $275,000 for expenses and an additional $2 million contingent on certain events occurring within one and a half years.[128] In considering the plaintiff's request to inspect books and records to investigate corporate wrongdoing, the *U.S. Die Casting* Court found a credible basis to infer wrongdoing because, despite having not breached the merger agreement, Security First Corp. had paid Mid Am Inc.'s expenses—$25,000 more than was even required by the merger agreement had a breach occurred—and

---

[126] Rizzolo's Reply Trial Br. at 10 n.20 (internal quotations omitted).
[127] 711 A.2d 1220, 1223 (Del. Ch. 1996).
[128] *Id.* at 1223–24.

agreed to extend the period covered by the termination fee by six additional months; the Court found that the company's rationale for termination was "patent sophistry," considering fundamental differences in management philosophy should have been apparent to the company upon reasonable investigation prior to entering the merger agreement, and that the termination could be reasonably interpreted, "[i]n the absence of full and open dissemination of information to shareholders," as a "thinly veiled attempt at entrenchment."[129]  On appeal, the Supreme Court upheld this Court's finding of a credible basis to investigate mismanagement based on these facts.[130]

I do not read *U.S. Die Casting*, as does Rizzolo, to hold that a failed merger in itself constitutes a credible basis from which I may infer corporate wrongdoing. *U.S. Die Casting* involved specific facts explicable as supporting improper entrenchment on the part of the directors in breach of their fiduciary duties.  Unlike in *U.S. Die Casting*, here there was a material change in circumstances following AbbVie entering the Co-Operation Agreement—the loss of the tax benefits attending the Treasury Notice—that led the Company's board to terminate the Proposed Inversion.  Rizzolo does not suggest that AbbVie's board was motivated by self-preservation, and the board's legitimate business reason for terminating the Proposed Inversion, which the Company disclosed at length to its stockholders,

---

[129] *Id.* at 1225.
[130] *See Security First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568–69 (Del. 1997).

further belies any specter of entrenchment. In addition, the *U.S. Die Casting* Court's suspicions surrounding Security First Corp.'s seemingly gratuitous agreement to extend the termination fee period and to pay expenses, including excessive expenses, are not present here, as the Plaintiffs do not dispute that AbbVie was obligated under the Co-Operation Agreement to pay the Break Fee. Therefore, *U.S. Die Casting* is not controlling here.

In sum, the Plaintiffs have shown, at most, that AbbVie's directors were aware of the risk that the government would act to eliminate the tax benefits of inversions; that the directors intentionally took that risk and bet a tremendous amount of the stockholders' money on the chance that the risk would not come to pass; and that the risk ultimately did come to pass, leading to a spectacular failure of the Proposed Inversion and a huge loss to the stockholders. These facts fail to show a credible basis that the Company's directors have breached their duty of loyalty, and are not sufficient to sustain a Section 220 inspection under the circumstances.

### 2. Investigating Aiding and Abetting by J.P. Morgan

Rizzolo also seeks certain books and records to investigate J.P. Morgan for aiding and abetting breaches of fiduciary duties by AbbVie's directors. The parties dispute whether an investigation of a corporation's third-party advisor for aiding and abetting breaches of fiduciary duties is a proper purpose under Section 220.

43

This Court has previously considered such a request on at least one occasion and found that the purpose was improper. In *Saito v. McKesson HBOC, Inc.* then-Chancellor Chandler held that the plaintiff "failed to persuade the Court that using a § 220 action against a company in which he owns shares is a proper vehicle for examining the conduct of third-party advisors to the company with the ultimate view of filing separate actions against the third-party advisors."[131] On appeal, the Supreme Court remanded the case with the clarification that "[t]he source of the documents and the manner in which they were obtained by the corporation have little or no bearing on a stockholder's inspection right" *if* the stockholder has shown that the documents are necessary and essential to satisfy the stockholder's proper purpose; the Supreme Court acknowledged and left unmolested, however, Chancellor Chandler's ruling that the plaintiff's "interest in pursuing claims against [the defendant's] advisors was not a proper purpose."[132]

I see no reason to depart from this Court's holding in *Saito*. Rizzolo has failed to show that investigating J.P. Morgan for aiding and abetting is reasonably related to his interest as a stockholder of AbbVie. Above, I have found that no credible basis exists to infer that AbbVie's directors engaged in non-exculpated corporate wrongdoing, meaning that any aiding and abetting claim would have to

---

[131] 2001 WL 818173, at *6 (Del. Ch. July 10, 2001), *aff'd in relevant part*, 806 A.2d 113 (Del. 2002).

[132] *Saito*, 806 A.2d at 118.

be based on a breach of the AbbVie directors' duty of care. Assuming for purposes of this analysis that Rizzolo has demonstrated a credible basis to find that such an underlying breach occurred, an aiding-and-abetting claim would have to exist as an independent action, as AbbVie's directors are exculpated from liability pursuant to Section 102(b)(7). While it is true that J.P. Morgan could still be found liable to AbbVie's stockholders for aiding and abetting exculpated corporate wrongdoing of AbbVie's directors,[133] that potential litigation is an asset of the Company. Rizzolo has failed to demonstrate a credible basis from which I may infer that AbbVie's directors could not make a decision on behalf of the Company as to whether the Company should pursue an action against J.P. Morgan, given that the directors themselves would be exculpated from personal liability for the underlying breach.[134] Without categorically finding that investigation of third-party liability may never represent a proper purpose, under these facts I do not find that Rizzolo has shown a proper purpose to inspect the Company's books and records to investigate J.P. Morgan for aiding and abetting breaches of fiduciary duties by AbbVie's directors and officers.

---

[133] *See In re Rural Metro Corp. S'holder Litig.*, 88 A.3d 54, 86 (Del. Ch. 2014) (rejecting the argument of the defendant's financial advisor that the defendant company's exculpatory provision should apply equally to a party charged with aiding and abetting a breach of fiduciary duty, finding: "That is not what Section 102(b)(7) authorizes. The literal language of Section 102(b)(7) only covers directors; it does not extend to aiders and abettors.").
[134] Nothing prevents Rizzolo from making a demand on the Company's board to consider an action against J.P. Morgan. Rizzolo has not sought documents in this action to determine whether such a demand would be futile.

## III. CONCLUSION

The Plaintiffs point out that AbbVie's directors assumed a very substantial risk on behalf of the Company in connection with the Proposed Inversion with Shire, a risk that proved a very bad bet for the Company, indeed. Assessing such risk is a core directorial function; fulfilling that function poorly, without more, is not actionable under our law. For the foregoing reasons, I deny SEPTA's and Rizzolo's demands for inspection of books and records pursuant to Section 220.[135] The parties in each action should submit an appropriate form of order.

---

[135] Because I find that the Plaintiffs have failed to show a proper purpose for their inspections, I do not address the scope of the documents sought.